# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 41679

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Boise, January 2015 Term** |
| **PHILIP MORRIS, INC., R.J. REYNOLDS** | ) | |
| **TOBACCO COMPANY, LORILLARD** | ) | **2015 Opinion No. 55** |
| **TOBACCO COMPANY, INC.,** | ) | |
| **COMMONWEALTH BRANDS, INC.,** | ) | **Filed: June 22, 2015** |
| **COMPANIA INDUSTRIAL DE TABACOS** | ) | |
| **MONTE PAZ, S.A., DAUGHTERS & RYAN,** | ) | **Stephen Kenyon, Clerk** |
| **INC., HOUSE OF PRINCE A/S, JAPAN** | ) | |
| **TOBACCO INTERNATIONAL U.S.A., INC.,** | ) | |
| **KING MAKER MARKETING, INC.,** | ) | |
| **KRETEK INTERNATIONAL, INC.,** | ) | |
| **LIGGETT GROUP LLC, PETER** | ) | |
| **STOKKEBYE TOBAKSFABRIK A/S, P.T.** | ) | |
| **DJARUM, SANTA FE NATURAL** | ) | |
| **TOBACCO COMPANY, INC.,** | ) | |
| **SCANDINAVIAN TOBACCO GROUP** | ) | |
| **LANE LTD., SHERMAN 1400 BROADWAY** | ) | |
| **N.Y.C., INC., TOP TOBACCO, L.P., and** | ) | |
| **VON EICKEN GROUP, foreign** | ) | |
| **corporations,** | ) | |
| | ) | |
| **Defendants-Respondents,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **RJR NABISCO HOLDINGS CORP., RJR** | ) | |
| **NABISCO, INC., AMERICAN TOBACCO** | ) | |
| **CO., INC., BROWN & WILLIAMSON** | ) | |
| **TOBACCO CORP., LIGGETT & MYERS,** | ) | |
| **INC., UNITED STATES TOBACCO CO.,** | ) | |
| **B.A.T. INDUSTRIES, PLC, BRITISH** | ) | |
| **AMERICAN TOBACCO CO., LTD., THE** | ) | |
| **COUNCIL FOR TOBACCO RESEARCH –** | ) | |
| **U.S.A., INC., AND TOBACCO INSTITUTE,** | ) | |
| **INC., foreign corporations,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Lynn G. Norton, District Judge.

The judgment of the district court is <u>affirmed</u>.

Hon. Lawrence G. Wasden, Attorney General, Boise, for appellant. Michael Gilmore argued.

Brassey Crawford & Howell, PLLC, Boise and Jones Day, Washington, D.C., for respondent R.J. Reynolds Tobacco Company. Peter J. Biersteker argued.

Evans Keane LLP, Boise, for respondent Philip Morris USA, Inc.

Andersen Banducci, PLLC, for respondent Lorillard Tobacco Company.

Varin Wardwell Thomas & Kunkel, LLC, Boise and Baker & Hostetler, LLP, Washington D.C., for respondents Commonwealth Brands, Inc., Compania Industrial de Tobacos Monte Paz, S.A., Daughters & Ryan, Inc., House of Prince A/S, Japan Tobacco International U.S.A., Inc., King Maker Marketing, Inc., Kretek International, Inc., Liggett Group LLC, Peter Stokkebye Tobaksfabrik A/S, P.T. Djarum, Santa Fe Natural Tobacco Company, Inc., Scandinavian Tobacco Group Lane Ltd., Sherman 1400 Broadway N.Y.C., Inc., Top Tobacco, L.P., Von Eicken Group. Robert J. Brookhiser argued.

_____

HORTON, Justice.

The State of Idaho appeals the judgment entered by the district court denying the State's motion to vacate portions of a Stipulated Partial Settlement and Award entered by an arbitration panel. This case arises out of the 1998 Tobacco Master Settlement Agreement, wherein certain cigarette manufacturers entered into an agreement with the State to pay damages for the cost of treating smoking-related illnesses. A dispute arose between the parties as to the amount owed in 2003 and the district court entered an order compelling arbitration. The arbitration panel entered a Stipulated Partial Settlement and Award in March of 2013. In June of 2013, the State moved the district court to vacate, modify, or correct the award. The district court concluded the State did not have standing to move to vacate or modify the award. The State appealed. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the 1990s, litigation arose between the states and tobacco companies regarding responsibility for the costs of treating tobacco-related illness. On November 23, 1998, Idaho and fifty-one other states and territories (MSA States) entered into the Master Settlement Agreement

2

(MSA) with various tobacco companies in the United States (the Participating Manufacturers). Under the MSA, the MSA States released their claims against these major domestic cigarette manufacturers. In return, the Participating Manufacturers agreed to make annual payments to the MSA States and to abide by cigarette marketing and advertising restrictions. Since the signing of the MSA, additional cigarette manufacturers, known as Subsequent Participating Manufacturers, have signed onto the MSA. For purposes of this appeal, the Participating Manufacturers and Subsequent Participating Manufacturers will be collectively referred to as the PMs.

Under the MSA, on April 15 of each year, in perpetuity, each PM is required to pay its relative market share of an agreed upon amount into an escrow account (MSA Annual Payments). Payments are not made directly to the states; instead, the PMs make payments to an Independent Auditor in an amount determined by the Independent Auditor based on the PMs' relative market share. The Independent Auditor then allocates the payments among the MSA States based on each state's allocable share percentage (Allocable Share); Idaho's Allocable Share is .36%. In 2002, Idaho received approximately $25.2 million as its MSA Annual Payment.

If a PM or a MSA State disputes the final calculation made by the Independent Auditor, the disputed portion of the amount owed by the PMs is placed into the Disputed Payments Account (DPA). Money placed in the DPA is not subject to interest. Funds placed in the DPA are distributed to the appropriate payee once the dispute is finally resolved. Once the dispute is resolved, the Independent Auditor instructs the escrow agent to credit the funds to the appropriate party.

Each MSA Annual Payment is subject to annual adjustments, including an adjustment for inflation and an adjustment for the volume of cigarettes sold. This appeal relates to one annual adjustment, the Non-Participating Manufacturer Adjustment (NPM Adjustment). The NPM Adjustment is intended to account for any gain in market share obtained by those cigarette manufacturers which do not participate in the MSA, referred to as Non-Participating Manufacturers (NPMs). The NPM Adjustment is calculated by the Independent Auditor.

The intent of the NPM adjustment is to correct for the market advantage gained by NPMs resulting from the MSA. *See* Frank Sloan & Lindsey Chepke, *Litigation, Settlement, and the Public Welfare: Lessons from the Master Settlement Agreement*, 17 Widener L. Rev. 159, 199 (2011); *Commw. ex rel. Kane v. Philip Morris USA, Inc.*, No. 803, C.D. 2014, 2015 WL

3

1591342, at *1 (Pa. Commw. Ct. April 10, 2015). As a result of their responsibility to make the MSA Annual Payments to the states, the PMs have been required to increase the price of their cigarettes. As the NPMs have no such obligation, the PMs are placed at a competitive disadvantage. In order to compensate for this competitive disparity, the MSA requires that MSA States enact statutes mandating NPMs to make payments into escrow accounts in an amount comparable to that which they would have paid if they had entered into the MSA (Qualifying Statute). Idaho's Qualifying Statute is found at Idaho Code section 39-7803, and requires NPMs to place money into an escrow account proportional to the number of cigarettes sold in Idaho each year.

The MSA was structured to provide the MSA States with an incentive to enforce their Qualifying Statutes. This incentive is the NPM Adjustment, which reduces the PMs' MSA Annual Payment under certain circumstances. First, the market share of the PMs must decline by 2% or more, nationally, as compared to the PMs' market share in 1997. Second, if there is such a decline, an independent economic consultant must determine whether the MSA was a significant contributing factor in the PMs' loss of the market share. If the PMs experience a market share loss, and it is determined that this loss is due to the disadvantages experienced as a result of the MSA, then the NPM Adjustment is available to the PMs for that year.

However, an individual state may avoid the NPM Adjustment, thus receiving the entirety of its MSA Annual Payment, if that state has a Qualifying Statute and diligently enforced the provisions of such statute. As all MSA States have enacted a Qualifying Statute, the only question to be resolved regarding the NPM Adjustment is that of diligent enforcement. Although the MSA Annual Payment of a diligent state is not reduced by the NPM Adjustment, the MSA Annual Payment of a non-diligent state is reduced by the NPM Adjustment in an amount equal to its allocable share of the aggregate NPM Adjustment amount.

As increased incentive for enforcement of the Qualifying Statutes, the NPM Adjustment attributable to those states that have diligently enforced their Qualifying Statutes is reallocated among the non-diligent states. In short, the national burden of the NPM Adjustment is borne by the non-diligent states on a pro rata basis in proportion to their respective Allocable Shares. This creates a two-step reduction in the MSA Annual Payment for non-diligent states: first, a reduction for the non-diligent state's share of the NPM Adjustment; and second, a pro rata share of the reallocated NPM Adjustment.

4

Despite every MSA State enacting a Qualifying Statute, the PMs experienced a market share loss following the MSA. The NPM Adjustments for the years 1999 through 2002 were resolved by settlement. However, no such agreement was reached by the PMs with the MSA States for 2003.

The Independent Auditor determined that the PMs experienced a market share loss for the year 2003 and an independent economic consultant determined that the MSA was a significant factor contributing to the 2003 market share loss. The PMs requested that the Independent Auditor apply the NPM adjustment to all MSA States and the states requested that the Independent Auditor presume diligent enforcement and not apply the 2003 NPM Adjustment. Because each state had enacted a Qualifying Statute, the Independent Auditor presumed diligent enforcement. The PMs challenged this presumption and certain PMs withheld a portion of the MSA Annual Payment based on the estimated 2003 NPM Adjustment. This money was placed in the DPA.

On April 25, 2006, the State asked the district court to declare that Idaho had diligently enforced its Qualifying Statute and thus, that Idaho was exempt from the 2003 NPM Adjustment. The PMs responded by asking the district court to compel arbitration, arguing that arbitration of the diligent enforcement issue was required under the MSA. Under the MSA:

> Any dispute, or controversy or claim arising out of or related to calculations performed by, or any determination made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any adjustments, reductions, offsets, carry-forwards and allocations . . .) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge.

On June 30, 2006, the district court concluded that arbitration of the dispute over diligent enforcement was mandated by the language of the MSA. The state courts of every MSA State except Montana likewise ordered arbitration of the 2003 NPM Adjustment dispute. In December of 2008, these states and the PMs entered into an Agreement Regarding Arbitration. The primary substantive matter to be decided in arbitration was whether individual states "diligently enforced a Qualifying Statute in 2003 . . . ." The parties selected an arbitration panel of three former federal judges: the Honorable Abner J. Mikva, the Honorable William G. Bassler, and the Honorable Fern M. Smith (the Panel).

Arbitration began in July of 2010. Following discovery, the PMs contested the diligent enforcement of the Qualifying Statute of thirty-five states, and did not contest the diligent

5

enforcement of seventeen states. The PMs did not contest Idaho's diligent enforcement, and as a result, there is no dispute that Idaho is exempt from the 2003 NPM Adjustment. The Panel then held individual state-specific hearings to determine whether that state diligently enforced its Qualifying Statute. As the state specific hearings progressed, a subset of those states whose diligent enforcement was challenged entered into settlement negotiations with the PMs.

Twenty-two states settled with the PMs (Signatory States). The Signatory States and PMs' agreement is referred to as the "Term Sheet." The Signatory States represent 46% of the aggregate allocable share of the MSA.[1] Under the Term Sheet, the NPM Adjustments for the Signatory States for 2003 through 2012 were resolved completely and the parties agreed to a new method for calculating adjustments for the years 2013 and 2014. For post-2014 adjustments, the Term Sheet created a streamlined method of calculation. For the years 2003 through 2012, the PMs agreed to a one-time payment derived from the PMs releasing their allocable share of the NPM Adjustment funds that were placed in the DPA in return for the Signatory States giving the PMs credits against each Signatory State's MSA Annual Payment for five years.

The Signatory States and the PMs offered a Proposed Stipulated Award accepting and implementing the Term Sheet to the Panel. Of those states that did not sign on to the Term Sheet (Non-Signatory States), twenty-seven objected to the Term Sheet and the Proposed Stipulated Award (Objecting States). Idaho was an Objecting State.

The Objecting States argued that the Panel did not have jurisdiction to enter the Proposed Stipulated Award because it was not authorized to arbitrate anything other than the 2003 NPM Adjustment. The Objecting States also argued that implementing the Term Sheet's action on the NPM Adjustment was contrary to the MSA and adversely affected the Non-Signatory States by increasing the risk associated with reallocation of the NPM Adjustment among non-diligent states. Finally, the Objecting States asserted that the release of DPA funds in a lump sum to the Signatory States from the DPA was contrary to the MSA and adversely affected the Non-Signatory States as it could reduce the amount available to the Non-Signatory States down the road.

The Panel issued its Stipulated Partial Settlement and Award on March 12, 2013 (Partial Award). The Panel concluded that it had jurisdiction to enter the Partial Award because the Panel

---

[1] The PMs note that since arbitration concluded, two more states separately settled with the PMs on similar terms, bringing the aggregate allocable share of states that have settled to nearly 50%.

had authority to decide all matters necessary to dispose of the 2003 claim including authority to determine the effect of the settlement. The Panel reasoned that it was not imposing the Term Sheet on the Non-Signatory States; rather, it was simply giving effect to the Signatory Parties' agreed settlement and directing the Independent Auditor to implement the settlement. The Panel explained:

> This Stipulated Partial Settlement and Award is limited to: (a) incorporating the provisions of the Term Sheet that govern the amount and mechanism of monetary payments (amounts to be received by the PMs and the DPA funds to be released) as among the [Signatory States and PMs]; (b) directing the Independent Auditor to implement those provisions; (c) ruling how the 2003 NPM Adjustment will be allocated in light of the settlement among the Non-Signatory States that did not diligently enforce a Qualifying Statute in 2003; and (d) ruling on the objections raised by the Objecting States.

The Partial Award ordered the implementation and release of DPA funds based on the Term Sheet by the Independent Auditor. However, the Panel concluded that, "[i]n so doing, the Independent Auditor will ensure that the Non-Signatory States' aggregate Allocable Share of both the NPM Adjustment funds now in the DPA (principal and earnings) and the additional amounts to be paid into the DPA . . . remains in the DPA."

The Panel then determined how the reallocation of the NPM Adjustment among the Non-Signatory States would be conducted due to the settlement. The Panel concluded that "[t]he dollar amount of the 2003 NPM Adjustment will be reduced by a percentage equal to the aggregate Allocable Shares of the Signatory States" and that "[t]he Independent Auditor will treat the Signatory States as *not subject* to the 2003 NPM Adjustment" for purposes of the reallocation of the NPM Adjustment. The Panel determined that this pro rata reduction did not prejudice the Non-Signatory States.

> As to the distribution from the DPA, the Panel concluded:

> It is undisputed that under the MSA, the PMs have the right of first recovery for NPM Adjustment funds in the DPA . . . . Under the Term Sheet, the PMs have waived that right for the Signatory States, allowing the Signatory States to recover their Allocable Share of those DPA funds. The PMs' limited DPA waiver for the Signatory States in no way prejudices the Non-Signatory States, legally or otherwise. The Non-Signatory States have no entitlement to the favorable treatment that the PMs have afforded the Signatory States as part of the consideration for settling their dispute. Nor will that favorable treatment harm the Non-Signatory States. [The Non-Signatory States] have failed to demonstrate any reasonable likelihood that they will recover less from the DPA than they would have recovered absent the settlement. Moreover, the PMs have expressly

committed that, if any Non-Signatory State ever later demonstrates that it is at risk of recovering less from the DPA than it would have recovered from the DPA absent the settlement, the PMs will allow that State to recover the extra amount from the DPA and will themselves recover any resulting unpaid share of the NPM Adjustment through an appropriate credit against next year's annual payment.

Following entry of the Partial Award, on June 5, 2013, the State moved the district court to vacate portions of the Partial Award that "incorporated" portions of the Term Sheet that apply to "years after 2003 . . . on the grounds that these sections go beyond the 2003 NPM Adjustment Arbitration Panel's power because they dealt with monies for years after 2003." The State sought release of NPM Adjustment funds for years after 2003 based on the MSA, which the State argued was improperly replaced by the Term Sheet. The State argued that under the Federal Arbitration Act (FAA), the State only needed to show that the Panel exceeded its power or awarded on a matter not submitted to them. Certain PMs and SPMs[2] opposed the motion, arguing that the State lacked standing to challenge the Partial Award and that the State's argument failed on the merits.

The district court concluded that the State lacked standing to challenge the Partial Award's post-2003 provisions, reasoning that "Idaho does not allege and cannot demonstrate that it has or will suffer any injury as a result of the Partial Award's implementation of the post-2003 provisions of the Term Sheet." Based upon this conclusion, the district court did not consider the merits of the State's motion. On November 20, 2013, the district court issued its final judgment denying the State's motion to vacate the award. The State timely appealed.

## II. STANDARD OF REVIEW

"Jurisdictional issues, like standing, are questions of law, over which this Court exercises free review." *In re Jerome Cnty. Bd. of Comm'rs*, 153 Idaho 298, 308, 281 P.3d 1076, 1086 (2012); *see also Taylor v. Maile*, 146 Idaho 705, 709, 201 P.3d 1282, 1286 (2009) ("We exercise free review over questions of jurisdiction, and such questions must be addressed prior to reaching the merits of an appeal.").

## III. ANALYSIS

The dispositive issue of this appeal is whether the State had standing to pursue its motion to vacate portions of the Partial Award. We conclude that the State had the burden to show an

---

[2] The PMs on appeal are two separate groups: (1) R.J. Reynolds Tobacco Company, Philip Morris USA, Inc., and Lorillard Tobacco Company; and (2) certain subsequent participating manufacturers. Throughout, these two groups of tobacco manufacturers will be referred to as simply the PMs as their arguments to this Court are essentially identical.

injury in fact and that the State failed to meet this burden. As a result, we affirm the decision of the district court.

The district court held that the State was required to demonstrate injury in order to have standing to pursue its motion. The district court concluded that the State failed to show an injury in fact. On appeal, the State's argument is essentially two-fold. First, the State argues that when seeking relief from an arbitration award under the FAA[3], the State is not required to show harm to vacate an award that exceeded the arbitrators' power. Second, the State argues that the district court erred in looking to the merits of the State's motion when determining whether the State alleged an injury in fact. The State argues: (1) it only needed to *allege* an injury in fact, that it need not show legal prejudice or a cognizable injury; and (2) that nonetheless, the State demonstrated an injury in fact because post-2003 NPM Adjustment funds were not released to it which should have been under MSA provisions that the arbitrators displaced with the Term Sheet.

The PMs argue the State must prove an injury in fact. Further, they assert that the Panel's Partial Award did not injure the State because selective release of the DPA funds was permissible after the Signatory States' 2003 NPM Adjustment and future adjustments were resolved with finality through the Term Sheet and settlement. The PMs also argue that the district court did not improperly analyze the merits of the claim because standing cannot be premised on a purely hypothetical injury.

We first consider whether the district court correctly determined that the State must show an injury in fact when alleging an arbitration award exceeded the arbitrators' powers under the FAA. Under the FAA, a court "may make an order vacating the award upon the application of any party to the arbitration" in an instance "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Courts have the power to "modify or correct the award" when "the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted." 9 U.S.C. § 11(b).

---

[3] The parties do not dispute that the NPM Adjustment arbitration is governed by the FAA pursuant to the MSA. We have noted that there is virtually no distinction between Idaho's Uniform Arbitration Act and the FAA. *Wattenbarger v. A.G. Edwards & Sons, Inc.*, 150 Idaho 308, 316 n.1, 246 P.3d 961, 969 n.1 (2010). Under Idaho Code section 7-912, "the court shall vacate an award where . . . The arbitrators exceeded their powers . . . ." Under Idaho Code section 7-913, "the court shall modify or correct the award where . . . The arbitrators have awarded upon a matter not submitted to them and the award may be corrected without affecting the merits of the decision upon the issues submitted . . . ."

9

However, "[i]t is a fundamental tenet of American jurisprudence that a person wishing to invoke a court's jurisdiction must have standing." *Young v. City of Ketchum*, 137 Idaho 102, 104, 44 P.3d 1157, 1159 (2002). And when challenging an arbitration award under the FAA, traditional notions of justiciability, including standing, must still be met. *See, e.g., Bacashihua v. U.S. Postal Serv.*, 859 F.2d 402, 405 (6th Cir. 1988) (finding plaintiff lacked standing to maintain an appeal under the FAA).

The State argues that it showed an injury because post-2003 NPM Adjustment funds were not released to it, but should have been under the MSA provisions that the arbitrators displaced with the Term Sheet. The State argues the district court required the State to show more than required to prove standing and erroneously considered the merits of the case to determine standing. The PMs argue that due to the nature of the motion, the district court properly looked to the Partial Award when addressing the issue of standing.

Concepts of justiciability, including standing, identify appropriate or suitable occasions for adjudication by a court. *Miles v. Idaho Power Co.*, 116 Idaho 635, 639, 778 P.2d 757, 761 (1989); *Justiciability*, 13 Fed. Prac. & Proc. Juris. § 3529 (2014 3d ed.). This Court has explained that a justiciable controversy is

> distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot . . . . The controversy must be definite and concrete, touching the legal relations of the parties having adverse legal interests . . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Davidson v. Wright*, 143 Idaho 616, 620, 151 P.3d 812, 816 (2006) (quoting *Weldon v. Bonner Cnty. Tax Coal.*, 124 Idaho 31, 36, 855 P.2d 868, 873 (1993), overruled on other grounds by *City of Boise City v. Keep the Commandments Coal.*, 143 Idaho 254, 141 P.3d 1123 (2006)). Standing "focuses directly on the question whether a particular interest or injury is adequate to invoke the protection of judicial decision." *Relation to Other Justiciability Doctrines*, 13B Fed. Prac. & Proc. Juris. § 3531.12 (2014 3d ed.). This Court has explained that "[s]tanding is a preliminary question to be determined by this Court before reaching the merits of the case." *Young*, 137 Idaho at 104, 44 P.3d at 1159. The inquiry "focuses on the party seeking relief and not on the issues the party wishes to have adjudicated." *Id.*

"Idaho has adopted the constitutionally based federal justiciability standard." *ABC Agra, LLC v. Critical Access Grp., Inc.*, 156 Idaho 781, 783, 331 P.3d 523, 525 (2014); *Koch v.*

10

*Canyon Cnty.*, 145 Idaho 158, 161, 177 P.3d 372, 375 (2008) ("When deciding whether a party has standing, we have looked to decisions of the United States Supreme Court for guidance."). Under U.S. Supreme Court jurisprudence, to establish standing "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'like[lihood]' that the injury 'will be redressed by a favorable decision.' " *Susan B. Anthony List v. Driehaus*, ___ U.S. ___, ___, 134 S.Ct. 2334, 2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). An injury sufficient to satisfy the requirement of an injury in fact "must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (internal quotations omitted) (quoting *Lujan*, 504 U.S. at 560).

The State relies on *Young v. City of Ketchum* to argue that all it must do to establish standing is *allege* an injury in fact. It is true that *Young* reiterates our oft-cited statement that to satisfy the standing requirement, "a litigant must 'allege or demonstrate an injury in fact and a substantial likelihood the relief requested will prevent or redress the claimed injury.' " 137 Idaho at 104, 44 P.3d at 1159 (quoting *Van Valkenburgh v. Citizens for Term Limits*, 135 Idaho 121, 124, 15 P.3d 1129, 1132 (2000)); *see also Camp Easton Forever, Inc. v. Inland Nw. Council Boy Scouts of Am.*, 156 Idaho 893, 897, 332 P.3d 805, 809 (2014); *Thomson v. City of Lewiston*, 137 Idaho 473, 477, 50 P.3d 488, 492 (2002); *Boundary Backpackers v. Boundary Cnty.*, 128 Idaho 371, 375, 913 P.2d 1141, 1145 (1996); *Miles*, 116 Idaho at 641, 778 P.2d at 763 (citing *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 72 (1978)). While we have often repeated the "allege or demonstrate" standard, this is an incomplete statement of the requirements for standing. Consistent with the federal standard, *Young* also holds that standing "requires a *showing* of a 'distinct palpable injury' and 'fairly traceable causal connection between the claimed injury and the challenged conduct.' " *Id.* (emphasis added) (quoting *Miles*, 116 Idaho at 639, 778 P.2d at 761). This Court has defined palpable injury as an injury that is easily perceptible, manifest, or readily visible. *Martin v. Camas Cnty. ex rel. Bd. of Comm'rs*, 150 Idaho 508, 513 n.3, 248 P.3d 1243, 1248 n.3 (2011).

A review of our earlier decisions relating to this standard reveals that the detail required to show standing is not uniform or universal. To the contrary, it varies with the circumstances of the case. We have recognized that the standing requirement is "imprecise and difficult to apply." *Young*, 137 Idaho at 104, 44 P.3d at 1159. Thus, while some standing questions can be answered

without a factual inquiry, others require greater detail, specificity and authority. *See Raising The Issue*, 13B Fed. Prac. & Proc. Juris. § 3531.15 (2014 3d ed.).

At the very least, however, standing can never be assumed based on a merely hypothetical injury. *Young*, 137 Idaho at 104, 44 P.3d at 1159; *see Day v. Bond*, 500 F.3d 1127, 1137–38 (10th Cir. 2007) ("Supreme Court precedent bars us from assuming jurisdiction based upon a hypothetical legal injury."). Indeed, when standing is challenged, mere allegations are not sufficient, and the party invoking the court's jurisdiction must demonstrate facts supporting this allegation. *See, e.g., Martin*, 150 Idaho at 513–14, 248 P.3d at 1248–49; *see also Pub. Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708, 714 n.22 (D.C. Cir. 1977).

*Martin* provides an example of this inquiry. In *Martin*, the plaintiff filed a complaint for declaratory judgment seeking an injunction to prevent implementation of an amended zoning ordinance. 150 Idaho at 509, 248 P.3d at 1244. The County moved for summary judgment, arguing that the plaintiff did not have standing. *Id.* at 510, 248 P.3d at 1245. We rejected the plaintiff's claim of standing based upon a reduction in the value of property he owned due to a zoning change affecting property that the plaintiff had "no interest in." 150 Idaho at 513, 248 P.3d at 1248. We concluded the plaintiff did not have standing in the absence of "resultant specific and traceable harm." *Id.* Rather, the plaintiff's claims were "speculative" and were not "specific or distinct and palpable." *Id.* at 514, 248 P.3d at 1249.

The State contends that its injury consists of its exclusion from the release of NPM Adjustment funds from the DPA which the Settling States received based upon the Term Sheet, rather than the MSA. That is, the Settling States received a distribution of NPM Adjustment Funds from the DPA for years after 2003 and Idaho did not.

The Partial Award incorporates the Term Sheet. The Term Sheet governs the amount and mechanism of payments to be released from the DPA to the Signatory States. Beyond incorporating the Term Sheet, the Partial Award addressed how the 2003 NPM Adjustment would be allocated in light of the settlement. The Partial Award provides that in implementing the Term Sheet and releasing funds from the DPA to the Signatory States, "the Independent Auditor will ensure that the Non-Signatory States' aggregate Allocable Share of both the NPM Adjustment funds now in the DPA (principal and earnings) and the additional amounts to be paid to the DPA . . . remains in the DPA." The Panel concluded that the Partial Award and "Term Sheet do not legally prejudice or adversely affect the Non-Signatory States." The Panel

explained, release of funds from the DPA to the Signatory States was allowed because it was consideration for the settlement of their dispute. Thus, the Non-Signatory States "have no entitlement to the favorable treatment . . . . Nor will that favorable treatment harm the Non-Signatory States." The Partial Award concluded that the Non-Signatory States "have failed to demonstrate any reasonable likelihood that they will recover less from the DPA than they would have recovered absent the settlement."

The State directs us to the MSA as authority for its entitlement to the DPA funds. However, under the MSA, funds may be disbursed from the DPA only when disputes are "resolved with finality." As to Idaho, only the year 2003 will be resolved with "finality" by the Panel. Thus, the State would not have been entitled to DPA funds under the terms of the MSA. Given that the Partial Award directed the Independent Auditor to make certain that the Non-Signatory States' aggregate Allocable Share of current and future NPM Adjustment funds remain in the DPA, there is no threat to Idaho's claim to its share of funds in the DPA. We are not persuaded by the State's claim that the Signatory States' receipt of DPA funds outside of the construct of the MSA constitutes an injury to Idaho. Simply put, the State's failure to receive funds to which it is not entitled to under the MSA does not constitute injury.

Because the State has failed to meet the requirements for standing, we do not address the merits of the State's appeal. It is important to note that our decision hinges on the limited scope of the arbitration proceeding. We are aware of similar motions to vacate portions of the Partial Award in sister jurisdictions and that at least two jurisdictions have granted motions to vacate portions of the Partial Award. *See Commw. ex rel. Kane v. Philip Morris USA, Inc.*, No. 803, C.D. 2014, 2015 WL 1591342 (Pa. Commw. Ct. April 10, 2015); *Missouri v. Am. Tobacco Co.*, No. 22972-01465, Order & J. (Mo. Cir. Ct. May 2, 2014). These cases demonstrate that under different circumstances, the State may have standing to challenge the Partial Award.

Both Pennsylvania and Missouri were found to be non-diligent states for purposes of the 2003 NPM Adjustment, and were thus subject to the increased burden of their proportional responsibility for the NPM Adjustment that would have been borne by the diligent states under the reallocation provisions of the MSA. Both states brought motions to vacate based upon the Partial Award's determination that reallocation under the NPM Adjustment would be "reduced by a percentage equal to the aggregate Allocable Shares of the Signatory States" and that the Signatory States would be deemed "not subject" to the 2003 NPM Adjustment. Given that the

13

PMs had alleged that 20 of the 22 Signatory States had not been diligent in the enforcement of their Qualifying Statutes, and a significantly higher percentage of the Non-Signatory States had been diligent, the practical effect of the Term Sheet was to transfer a disproportionately heavy share of the reallocation of the diligent states' NPM obligation to the six non-diligent, Non-Signatory States.[4] The Missouri and Pennsylvania courts both vacated the award as to the reallocation provision of the Partial Award and ordered the Independent Auditor to treat the Signatory States as non-diligent when calculating the NPM Adjustment.

There are two things to note about these decisions. The first is that the State has not challenged the portions of the Partial Award dealing with reallocation.[5] The second is that the State was determined to be a diligent state, and as such, is not exempt from the NPM Adjustment for 2003.

For the foregoing reasons, we affirm the decision of the district court.

### IV. CONCLUSION

We affirm the judgment of the district court denying the State's motion to vacate portions of the Partial Award. Costs on appeal to Respondents.

Chief Justice BURDICK, Justices J. JONES, W. JONES and Justice Pro Tem KIDWELL, **CONCUR**.

---

[4] The consequences to non-diligent Non-Signatory states are clearly injurious. For example, if the Signatory States had been treated as non-diligent rather than diligent, Pennsylvania's 2003 MSA Annual Payment would have been increased by more than $125 million.

[5] To be clear, if Idaho were challenging the reallocation provision, it would likely be able to show that it may suffer an injury in fact; however, this injury would not be ripe. "As compared to standing, ripeness assumes that an asserted injury is sufficient to support standing, but asks whether the injury is too contingent or remote to support present adjudication." *Sources Of Doctrine*, 13B Fed. Prac. & Proc. Juris. § 3532.1 (2014 3d ed.). "The traditional ripeness doctrine requires a petitioner or plaintiff to prove 1) that the case presents definite and concrete issues, 2) that a real and substantial controversy exists, and 3) that there is a present need for adjudication." *Noh v. Cenarrusa*, 137 Idaho 798, 801, 53 P.3d 1217, 1220 (2002). In other words, ripeness asks "whether there is any need for court action at the present time." *Miles v. Idaho Power Co.*, 116 Idaho 635, 642, 778 P.2d 757, 764 (1989). When no controversy has actually arisen, and it is shown that a controversy might never arise, the case is not ripe for judicial review. *See ABC Agra, LLC v. Critical Access Grp., Inc.*, 156 Idaho 781, 784, 331 P.3d 523, 526 (2014).

Because Idaho was determined to be diligent, the State cannot show the kind of injury for the 2003 year that Missouri and Pennsylvania experienced. The reallocation provision may cause injury to Idaho at some point in the future if Idaho is found to have not been diligent in its enforcement of its Qualifying Statute.