# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 43922

TRACY TUCKER, JASON SHARP, NAOMI
MORLEY, JEREMY PAYNE, on behalf of
themselves and all others similarly situated,

    Plaintiffs-Appellants,

v.

STATE OF IDAHO; C.L. "BUTCH"
OTTER, in his official capacity as Governor
of Idaho; HON. LINDA COPPLE TROUT,
DARRELL G. BOLZ, SARA B. THOMAS,
WILLIAM H. WELLMAN, KIMBER
RICKS, SEN. CHUCK WINDER, and REP.
CHRISTY PERRY, in their official capacities
as members of the Idaho State Public Defense
Commission,

    Defendants-Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, January 2017 Term

2017 Opinion No. 38

Filed: April 28, 2017

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada
County. Hon. Samuel A. Hoagland, District Judge.

District court order dismissing class action complaint, <u>affirmed</u> in part, <u>reversed</u>
in part and <u>remanded.</u>

American Civil Liberties Union of Idaho Foundation, Richard Alan Eppink,
Boise, for appellants. Jason D. Williamson argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondents
Governor C.L. "Butch" Otter, Trout, Bolz, Ricks, Winder and Perry. Michael S.
Gilmore, Deputy Attorney General argued.

Cantrill, Skinner, Lewis, Casey & Sorensen, LLP, Boise, for respondents Thomas
and Wellman. Daniel J. Skinner argued.

---

BURDICK, Chief Justice.

Tracy Tucker, Jason Sharp, Naomi Morley, and Jeremy Payne, on behalf of themselves
and all other similarly situated (Appellants), bring this appeal from the Ada County District

Court. Appellants filed a class action complaint in which they alleged Idaho's public defense system is inadequate under federal and state constitutional standards. The district court reasoned that Appellants' claims were not justiciable on standing, ripeness, and separation of powers grounds and dismissed the complaint. We affirm in part, reverse in part, and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellants constitute a putative class of criminal defendants who seek to challenge Idaho's public defense system. They filed a class action complaint on June 17, 2015. Appellants allege Idaho's public defense system violates the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 13 of the Idaho Constitution. As defendants, Appellants named (1) the State of Idaho; (2) Governor C.L. "Butch" Otter, in his official capacity; and (3) the seven members of the Idaho Public Defense Commission (PDC), in their official capacities.[1] Appellants seek various forms of equitable relief, including a declaration that Idaho's public defense system is unconstitutional and an injunction requiring Respondents to bring Idaho's public defense system into constitutional compliance.

Respondents moved to dismiss the complaint, arguing the case was not justiciable because Appellants did not sue the proper defendants. Since the provision of public defense has been delegated to Idaho's forty-four counties under Idaho Code section 19-859, Respondents maintained that Appellants erred by not suing the counties. Appellants countered that the State is ultimately responsible for ensuring constitutionally adequate public defense, contending they had sued the proper defendants.

The district court held that Appellants' claims were not justiciable and dismissed their complaint on standing, ripeness, and separation of powers grounds. This appeal timely followed.

## II. ISSUES ON APPEAL

1. Is the State of Idaho immune from state law claims alleging constitutional violations?
2. Do the justiciability doctrines bar this lawsuit?
3. Are Appellants entitled to attorney fees on appeal?

## III. STANDARD OF REVIEW

"Jurisdictional issues, like standing, are questions of law, over which this Court exercises free review." *In re Jerome Cnty. Bd. of Comm'rs*, 153 Idaho 298, 308, 281 P.3d 1076, 1086

---

[1] These three entities are collectively referred to as Respondents.

2

(2012). Similarly, this Court has free review over whether dismissal for lack of jurisdiction was properly granted. *See Meisner v. Potlatch Corp.*, 131 Idaho 258, 260, 954 P.2d 676, 678 (1998).

## IV.  ANALYSIS

We first address the two main bases of the district court's dismissal order: immunity, and the justiciability doctrines. We then address whether Appellants should receive attorney fees on appeal.

**A.  Is the State of Idaho immune from state law claims alleging constitutional violations?**

Appellants sued (1) the State of Idaho; (2) Governor C.L. "Butch" Otter, in his official capacity; and (3) the seven members of the Idaho Public Defense Commission (PDC), in their official capacities. Against each defendant, Appellants alleged claims under the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 13 of the Idaho Constitution. Concerning immunity, the district court held that the State was immune from the federal law claims alleged, but not the state law claims. The district court further held that neither Governor Otter nor the PDC have immunity. The only immunity issue before us on appeal is whether the State is immune from Appellants' state law claims alleging constitutional violations.

Respondents set forth two bases to contend the State is immune. First, they contend Idaho Rule of Civil Procedure 3(b) shields the State from claims under state law for injunctive relief. In relevant part, when the complaint was filed, Rule 3(b), entitled "Designation of Parties," provided:

> [A]ll civil actions by or against a governmental unit or agency, or corporation, shall designate such party in its governmental or corporate name only, and individuals constituting the governing boards of governmental units . . . shall not be designated as parties in any capacity unless the action is brought against them individually or for relief under Rules 65 or 74.

I.R.C.P. 3(b) (2015).[2]

Respondents bolster their argument with *Weyyakin Ranch Property Owners' Association, Inc. v. City of Ketchum*, 127 Idaho 1, 1–3, 896 P.2d 327, 327–29 (1995). In *Weyyakin*, the plaintiff sued the City of Ketchum, seeking to enjoin enforcement of a subdivision annexation ordinance. *Id.* The plaintiff obtained a temporary restraining order (TRO) enjoining the ordinance. *Id.* When the City of Ketchum, through its elected officials, failed to comply with the

---

[2] Effective July 1, 2016, this rule no longer exists. The only "Designation of Parties" rule that currently exists is Rule 3(c), which provides: "Any filing party must be designated as the plaintiff or petitioner, and any party against whom the same is filed must be designated as the defendant or respondent."

TRO, the district court held the officials in contempt. *Id.* On appeal, this Court held that the district court's contempt order violated Rule 3(b) because the complaint named the "City of Ketchum," not the "elected officials individually." *Id.* at 3, 896 P.2d at 329.

Respondents' argument is unavailing. Nothing in the plain language of Rule 3(b) shields the State from claims under state law for injunctive relief. Nor does *Weyyakin* support Respondents' argument. *Weyyakin* merely held that the district court erred by holding the elected officials in contempt because they were not named in the complaint "individually or for relief under Rules 65 or 74," as Rule 3(b) required. *Id.* As a result, "[b]ecause the temporary restraining orders failed to name the elected officials individually, the trial court never obtained jurisdiction over them, and therefore did not have the authority to find them in contempt." *Id.* Nothing similar is at issue in this case.

Second, Respondents argue the doctrine of sovereign immunity shields the State from Appellants' state law claims alleging constitutional violations. "It is the general rule that, under the doctrine of sovereign immunity, a governmental unit can only be sued upon its consent." *Bott v. Idaho State Bldg. Auth.*, 128 Idaho 580, 591, 917 P.2d 737, 748 (1996). Even so, many other jurisdictions hold that sovereign immunity does not apply when constitutional violations are alleged, as a contrary rule would render constitutional rights meaningless. *See, e.g.*, *Columbia Air Servs., Inc. v. Conn. Dep't of Transp.*, 977 A.2d 636, 645 (Conn. 2009); *Fla. Dep't of Revenue v. Kuhnlein*, 646 So. 2d 717, 721 (Fla. 1994); *Corum v. Univ. of N.C. Through Bd. of Governors*, 413 S.E.2d 276, 292 (N.C. 1992); *Ashton v. Brown*, 660 A.2d 447, 463 (Md. Ct. App. 1995); *Kilgo v. Ga. Dep't of Corrs.*, 413 S.E.2d 507, 508 (Ga. Ct. App. 1991).

Though we have never addressed the issue, we have recognized that because sovereign immunity is a common law doctrine, the judiciary has the power to modify it. *Haeg v. City of Pocatello*, 98 Idaho 315, 317, 563 P.2d 39, 41 (1977). Were we to accept Respondents' position that sovereign immunity shields the State from suit in this instance, we would leave parties unable to vindicate constitutional rights against the State. This we decline to do. Accordingly, aligning with our sister jurisdictions identified above, we hold that sovereign immunity is inapplicable when constitutional violations are alleged.

## B.     Do the justiciability doctrines bar this lawsuit?

The justiciability doctrines are the second basis of the district court's dismissal order. The justiciability doctrines "identify appropriate or suitable occasions for adjudication by a court."

4

*State v. Philip Morris, Inc.*, 158 Idaho 874, 881, 354 P.3d 187, 194 (2015). Before reviewing the district court's justiciability analysis, we take a moment to clarify which standard of review should be employed when justiciability challenges are made. We note that the district court applied Idaho Rule of Civil Procedure 12(b)(6). Rule 12(b)(6) governs dismissal for failure to state a claim, inquiring into the factual sufficiency of the substantive claims alleged. The justiciability doctrines, however, are wholly dissimilar from whether a substantive claim is adequately alleged. Indeed, the justiciability doctrines implicate jurisdiction. *E.g.*, *Martin v. Camas Cnty. ex rel. Bd. of Comm'rs*, 150 Idaho 508, 512, 248 P.3d 1243, 1247 (2011).

As such, we pronounce that justiciability challenges are subject to Idaho Rule of Civil Procedure 12(b)(1) since they implicate jurisdiction.[3] This, in turn, gives rise to a different standard of review than the one which Rule 12(b)(6) supplies. *See Owsley v. Idaho Indus. Comm'n*, 141 Idaho 129, 133 n.1, 106 P.3d 455, 459 n.1 (2005). The district court's error in this regard, however, does not constitute grounds for reversal. For one, our earlier cases left the issue unsettled. *Compare Martin*, 150 Idaho at 512, 248 P.3d at 1247 ("Where a plaintiff does not have standing it cannot be said that the 'case or controversy' requirement has been satisfied; therefore the judiciary lacks jurisdiction to hear the case."), *with Brooksby v. Geico Gen. Ins. Co.*, 153 Idaho 546, 547–48, 286 P.3d 182, 183–84 (2012) (addressing standing under Rule 12(b)(6)). Moreover, Appellants did not raise the issue in their opening brief. *See Gallagher v. State*, 141 Idaho 665, 669, 115 P.3d 756, 760 (2005) (explaining that issues not raised in the opening brief are waived). Thus, although we clarify which standard of review governs, we disregard the error. *See* I.R.C.P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").

Aligning our focus back to the present case, the district court's order addressed three justiciability doctrines: (1) standing; (2) ripeness; and (3) separation of powers.[4]

---

[3] The same is true in federal court, which results in justiciability challenges being reviewed under Rule 12(b)(1). *E.g.*, *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) ("The district court erroneously concluded that lack of Article III standing was grounds for dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim."). And, as we explained previously, "Idaho has adopted the federal justiciability requirement." *Noh v. Cenarrusa*, 137 Idaho 798, 801, 53 P.3d 1217, 1220 (2002).

[4] Appellants note that standing and ripeness were "never raised, briefed, or argued by either side," yet the district court addressed the doctrines. Even so, the justiciability doctrines can be raised *sua sponte* at any time. *See, e.g.*, *Campbell v. Parkway Surgery Ctr., LLC*, 158 Idaho 957, 962, 354 P.3d 1172, 1177 (2015) ("[T]his Court has a duty to raise the issue of standing *sua sponte*."); *Thomas v. City of N.Y.*, 143 F.3d 31, 34 (2d Cir. 1998) (explaining that because the " 'ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential

5

1. <u>Standing</u>

In a class action, standing is met if at least one named plaintiff satisfies the requirements of standing against every named defendant. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978 (9th Cir. 2011); *Henry v. Circus Circus Casinos, Inc.*, 223 F.R.D. 541, 544 (D. Nev. 2004). In order to have standing to seek injunctive relief, a plaintiff must demonstrate a likelihood of repeated injury or future harm to the plaintiff in the absence of the injunction. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983).

Appellants argue they have standing under the traditional and "relaxed" analyses. Both are discussed below.

(a) <u>The traditional standing analysis</u>

Under the traditional standing analysis, "the plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'like[lihood]' that the injury 'will be redressed by a favorable decision.' " *Philip Morris*, 158 Idaho at 881, 354 P.3d at 194 (citation omitted).

(i) <u>Injury in fact</u>

Injury in fact requires the injury to "be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* (citation omitted). The district court concluded Appellants' allegations did not satisfy this standard, emphasizing how Appellants had not been convicted or sentenced, nor had they pursued any appeal or post-conviction relief.

The district court erred on two primary bases. First, the district court erred factually by concluding no Appellant had been convicted. The complaint alleged Tucker had pled guilty and was awaiting sentencing. An affidavit filed with the complaint set forth the same information.

Second, the district court erred by attempting to undertake case-by-case inquiries into Appellants' individual criminal cases. The district court treated Appellants' allegations as subject to *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984), which contemplates case-by-case analyses of ineffective assistance of counsel claims by inquiring whether (1) counsel's performance was deficient; and (2) counsel's deficiency prejudiced the defendant. *Strickland* authorizes relief in individual criminal cases by, for example, allowing courts to vacate convictions due to counsel's ineffective assistance. The Court in *Strickland* was very clear about

---

reasons for refusing to exercise jurisdiction,' the court can raise it *sua sponte*, and, indeed, can do so for the first time on appeal." (citation omitted)).

the individualized analysis it was creating. *Id.* at 690 ("Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."). *Strickland*, therefore, is inapplicable when systemic deficiencies in the provision of public defense are at issue. *E.g.*, *Kuren v. Luzerne Cty.*, 146 A.3d 715, 746–47 (Pa. 2016); *Hurrell-Harring v. New York*, 930 N.E.2d 217, 221–22 (N.Y. Ct. App. 2010).

The issues raised in this case do not implicate *Strickland*. Appellants alleged systemic, statewide deficiencies plaguing Idaho's public defense system. Appellants seek to vindicate their fundamental right to constitutionally adequate public defense at the State's expense, as required under the Sixth Amendment to the U.S. Constitution, and Article I, Section 13 of the Idaho Constitution. They have not asked for any relief in their individual criminal cases. Rather, they seek to effect systemic reform. Their allegations find support in both *Gideon v. Wainwright*, 372 U.S. 335, 342 (1963), and *State v. Montroy*, 37 Idaho 684, 690, 217 P. 611, 614 (1923), which make clear that it is the State's obligation to provide constitutionally adequate public defense at critical stages of the prosecution. Alleging systemic inadequacies in a public defense system results in actual or constructive denials of counsel at critical stages of the prosecution suffices to show an injury in fact to establish standing in a suit for deprivation of constitutional rights. *Cf. Luckey v. Harris*, 860 F.2d 1012, 1016–17 (11th Cir. 1988), *cert. denied*, 495 U.S. 957 (1990).

As a result, we conclude Appellants satisfy the injury in fact standard because the complaint alleged actual and constructive denials of counsel at critical stages of the prosecution. A criminal defendant who is entitled to counsel but goes unrepresented at a critical stage of prosecution suffers an actual denial of counsel and is entitled to a presumption of prejudice. *See United States v. Cronic*, 466 U.S. 648, 658–60 (1984). As to allegations of actual denials of counsel, Tracy Tucker, Jason Sharp, and Jeremy Payne were not represented by counsel at their initial appearances. During the initial appearances, bail was set. Since Tucker, Sharp, and Payne could not afford to post bail, they remained in jail for varying lengths of time—three months for Tucker; two weeks for Sharp; and five months for Payne. These allegations illustrate violations of constitutional and statutory requirements. *See* I.C. § 19-852(1)(a); *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 194 (2008) ("This Court has held that the right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty.").

The complaint also alleged constructive denials of counsel. A constructive denial of counsel occurs when "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Ramsey v. State*, 159 Idaho 887, 891, 367 P.3d 711, 715 (Ct. App. 2015) (citing *Cronic*, 466 U.S. at 659–60). Naomi Morley, though represented by counsel via counsel's video presence at the initial appearance, had no opportunity to speak with counsel during her initial appearance. As to Morley, the complaint further alleged the following additional constructive denials:

> On information and belief, Ms. Morley's lawyer's caseload has been so large, and his resources so few, that he has been unable to review Ms. Morley's extensive comments on the police reports in her case or to investigate the vehicle involved in the accident before the state scrapped it, destroying that evidence. Further, Ms. Morley has been unable to communicate effectively or consistently with her attorney, and is concerned that her attorney is pressuring her to plead guilty because he does not have the time or resources to prepare sufficiently for trial.

As to Tracy Tucker, the complaint alleged the following constructive denials:

> As of 10 days prior to Mr. Tucker's trial date, his attorney's demanding schedule had prevented him from conducting any meaningful investigation into Mr. Tucker's case, reviewing and explaining to Mr. Tucker the relevant discovery materials, or discussing trial strategy with Mr. Tucker. On June 2, 2015, Mr. Tucker pleaded guilty to attempted strangulation, at which time he was released from jail. Mr. Tucker is scheduled to be sentenced on August 3, 2015, and faces up to 15 years in prison.

As to Jason Sharp, the complaint alleged the following constructive denials:

> Mr. Sharp has been unable to communicate effectively with his attorney regarding the status of his case. For instance, despite repeated requests from Mr. Sharp, his attorney has not yet provided him with a copy of the discovery materials in his case, leaving Mr. Sharp unclear about what evidence the State does or does not have against him, and making it impossible for Mr. Sharp to participate meaningfully in the development of his defense. Moreover, aside from several motions to continue his jury trial, Mr. Sharp's attorney has not filed any substantive motions on his behalf.

As to Jeremy Payne, the complaint alleged the following constructive denials:

> Unfortunately, during the five months he was in custody, Mr. Payne was unable to communicate with his attorney on a consistent basis. In light of the many other felony cases assigned to his attorney, Mr. Payne only met with counsel twice at the County Jail, both for very short periods of time. Aside from those brief meetings, Mr. Payne has only met with his attorney in court—for even shorter periods of time—just prior to his court appearances, and has been unable to contact his attorney by phone despite repeated attempts. Indeed, Mr. Payne has

spent a total of approximately 30–45 minutes with his attorney since the inception of his case. Moreover, to date, Mr. Payne's attorney has been unable to conduct any meaningful investigation into his case, review the relevant discovery with his client, or share with Mr. Payne his thoughts with regard to trial strategy and related matters.

Recognizing that our analysis at this juncture is simply whether Appellants have alleged injuries that are "concrete and particularized" and "actual or imminent," we conclude the above allegations meet the injury in fact standard.

(ii)     Causation

Causation requires the injury to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). The district court reasoned that causation could not be shown, emphasizing that the Legislature and the counties "are the principal bodies with the power to affect [sic] the policy (political) and systemic changes Plaintiffs seek." The district court, however, did not conduct separate causation analyses as to each defendant. Since causation looks at the conduct of each particular defendant, we analyze each separately.

(1)     State of Idaho

Concerning the State, Appellants satisfy the causation standard. The right to counsel is "made obligatory upon the *States* by the Fourteenth Amendment." *Gideon*, 372 U.S. at 342 (emphasis added); *see also Montroy*, 37 Idaho at 690, 217 P. at 614. The State, therefore, has ultimate responsibility to ensure that the public defense system passes constitutional muster. While the provision of public defense has been delegated to Idaho's forty-four counties under Idaho Code section 19-859, "the ultimate responsibility for fulfilling the . . . constitutional duty cannot be delegated." *See Osmunson v. State*, 135 Idaho 292, 296, 17 P.3d 236, 240 (2000) (explaining that the Legislature could delegate provision of public education to school districts, although it could not delegate the ultimate responsibility of fulfilling constitutional duties). Moreover, it cannot be said that the counties are third parties acting independently of the State with respect to public defense. Instead, the counties are political subdivisions of the State. *See, e.g.*, Idaho Const. art. XVIII, § 1; *State v. Peterson*, 61 Idaho 50, 54, 97 P.2d 603, 605 (1939). Because Appellants' alleged injuries are fairly traceable to the State, we hold that causation as to the State is met.

9

Unlike the State, the causal chain linking Appellants' injuries to Governor Otter is too attenuated for two primary reasons. First, as the district court reasoned, the provision of public defense has been delegated to Idaho's forty-four counties. I.C. § 19-859. Appellants cite to no authority suggesting that the counties are beholden to Governor Otter with respect to the provision of public defense. The counties therefore act independently of Governor Otter, which militates against causation as to him. *Bennett*, 520 U.S. at 167 (stating that causation means the injury cannot be "the result of the independent action of some third party not before the court."). Similarly, although Governor Otter appoints four of the seven PDC members, nothing suggests the PDC members—even those he appoints—are beholden to Governor Otter in any way. *See* I.C. § 19-849(1)(c). Instead, the PDC is a self-governing agency. I.C. § 19-849(1).

Equally unavailing is Appellants' position that Governor Otter is somehow responsible for preventing and remedying alleged statewide violations of the right to counsel. The complaint alleges, "[a]s the chief executive of the state, Governor Otter bears ultimate responsibility for the provision of constitutionally mandated services to the people of Idaho." Indeed, Governor Otter has the "supreme executive power" and is therefore required to "see that the laws are faithfully executed." *See* Idaho Const. art. IV, § 5. Even so, the weight of authority demonstrates that a general duty to enforce state laws is not sufficient to establish a causal connection. *E.g.*, *Women's Emer. Network v. Bush*, 323 F.3d 937, 949–50 (11th Cir. 2003) ("Where the enforcement power is the responsibility of parties other than the governor . . . the governor's general executive power is insufficient to confer jurisdiction."); *Long v. Van de Kamp*, 961 F.2d 151, 152 (9th Cir. 1992).

Attempting to establish a causal nexus with Governor Otter, Appellants cite to *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014). In *Kitchen*, the plaintiffs challenged Utah's ban on same-sex marriage, suing the governor, the attorney general, and the county clerk. *Id.* at 1200–01. Only county clerks could issue marriage licenses. *Id.* County clerks' duty to issue marriage licenses was "purely ministerial," and the State of Utah controlled the content of the marriage application form. *Id.* at 1202 n.1. Although county clerks issued marriage licenses, the Tenth Circuit found a causal nexus with the governor, reasoning as follows:

> The Governor and Attorney General have explicitly taken the position in this litigation that they "have ample authority to ensure that" the Salt Lake County Clerk "return[s] to her former practice of limiting marriage licenses to man-

10

woman couples in compliance with Utah law." This assertion is supported by the Utah Code. The Governor is *statutorily charged* with "supervis[ing] the official conduct of all executive and ministerial officers" and "see[ing] that all offices are filled and the duties thereof performed." § 67-1-1(1) & (2). In addition, he "may require the attorney general to aid any county attorney or district attorney in the discharge of his duties." § 67-1-1(7).

*Id.* at 1202 (emphasis added).

Similar to *Kitchen*, Governor Otter has authority to (1) "supervise the official conduct of all executive and ministerial officers"; and (2) "see that all offices are filled, and the duties thereof performed, or, in default thereof, apply such remedy as the law allows; and if the remedy is imperfect, acquaint the legislature therewith at its next session." I.C. §§ 67-802(1), -802(2). However, those duties are discretionary. As Idaho Code section 67-802 states, "the governor has th[ose] powers, and *may* perform th[ose] duties . . . ." (emphasis added). Whereas the statute in *Kitchen* mandated certain executive actions, here the statute simply grants Governor Otter discretionary power. *Compare* U.C. § 67-1-1, *with* I.C. § 67-802. And, unlike county clerks' "purely ministerial" duty in *Kitchen*, here the counties are left with significant discretion in fashioning the provision of public defense services. *See* I.C. § 19-859. Thus, *Kitchen* does not establish a causal nexus with Governor Otter.

Appellants cite also to *Los Angeles County Bar Association v. Eu*, 979 F.2d 697 (9th Cir. 1992). The plaintiff in *Eu* challenged the constitutionality of a statute prescribing the number of judges on the Superior Court for Los Angeles County. *Id.* at 700. The plaintiff alleged the statute resulted in a shortage of judges, which, in turn, caused inordinate delays in litigation, deprived access to the courts, and violated equal protection by causing litigants in Los Angeles County to suffer longer delays than litigants in neighboring counties. *Id.* The plaintiff sued the governor as a defendant, evidently based on his enforcement of the statute at issue via his appointment power to fill judicial vacancies. *Id.* at 701, 704. The Ninth Circuit concluded causation was satisfied, reasoning as follows:

> The chain of causation leading from a determination by this court that the dearth of judges in Los Angeles County is unconstitutional to correction of civil litigation delays may appear tenuous. However, it does not at any point depend upon the "unfettered discretion" of third parties. Were this court to issue the requested declaration, we must assume that it is substantially likely that the California legislature, although its members are not all parties to this action, would abide by our authoritative determination. *See Franklin v. Massachusetts*, 505 U.S. 788, ——, 112 S.Ct. 2767, 2777, 120 L.Ed.2d 636 (1992) (plurality). Once the legislature authorized more judicial positions for Los Angeles County,

11

> Governor Wilson would, according to the Bar Association, have a legal duty to fill those positions. Complaint at ¶¶ 29–30. Even if the new judges were assigned only to criminal and other high-priority cases, the speeding of those cases would inevitably reduce the delay in general civil litigation. We therefore conclude that the Bar Association has adequately demonstrated that, were this court to rule in its favor, it is likely that the alleged injury would be to some extent ameliorated.

*Id.* at 701. In short, because the governor in *Eu* enforced the statute at issue by making judicial appointments, causation was satisfied. *See id.*

Appellants fare no better under *Eu*. Unlike the governor's enforcement of the statute at issue via his appointment power in *Eu*, Governor Otter does not engage in similar conduct. Though he appoints four of the seven PDC members, Governor Otter's involvement with public defense ends there. Additionally, in *Eu*, the plaintiff challenged the statute limiting the number of judgeships. Appellants have not made any statutory challenge. Appellants challenge instead alleged systemic violations of the right to counsel. But, as noted, Governor Otter's general duty to enforce state law does not establish causation. *E.g.*, *Van de Kamp*, 961 F.2d at 152. Accordingly, Appellants do not satisfy causation as to Governor Otter.

### (3) The PDC

Concerning the PDC, Appellants satisfy the causation standard. The PDC was created on March 26, 2014. *See* Idaho Public Defense Act, S.L. 2014, ch. 247, § 2. When the complaint was filed on June 17, 2015, the PDC was tasked with the following duties:[5]

> (1) The state public defense commission shall:
>   (a) Promulgate rules in accordance with the provisions of chapter 52, title 67, Idaho Code, establishing the following:
>     (i) Training and continuing legal education requirements for defending attorneys, which shall promote competency and consistency in case types including, but not limited to, criminal, juvenile, abuse and neglect, post-conviction, civil commitment, capital and civil contempt; and
>     (ii) Uniform data reporting requirements for the annual reports submitted pursuant to section 19-864, Idaho Code. The data reported shall include caseload, workload and expenditures.
>   (b) On or before January 20, 2015, and by January 20 of each year thereafter as deemed necessary by the commission, make recommendations to the Idaho legislature for legislation on public defense system issues including, but not limited to:

---

[5] The PDC's powers have since been expanded. *See* Act of July 1, 2016, S.L. 2016, ch. 195, § 1. However, the PDC's expanded powers are not relevant to our causation analysis and instead are discussed with respect to redressability and ripeness. *See infra* Parts V(B)(1)(a)(iii)(2) & V(B)(2)(b).

      (i)  Core requirements for contracts between counties and private attorneys for the provision of indigent defense services and proposed model contracts for counties to use;

      (ii)  Qualifications and experience standards for the public defender and defending attorneys;

      (iii)  Enforcement mechanisms; and

      (iv)  Funding issues including, but not limited to:

            1. Training and continuing legal education for defending attorneys;

            2. Data collection and reporting efforts; and

            3. Conflict cases.

      (c)  Hold at least one (1) meeting in each calendar quarter.

I.C. § 19-850 (2015). In short, the PDC had three mandatory duties: (1) promulgating certain rules; (2) making legislative recommendations; and (3) holding quarterly meetings.

Of those three mandatory duties, we conclude the PDC's rulemaking duty satisfies causation. As stated, the PDC's rulemaking duty is twofold: (1) promulgate rules governing training requirements for public defenders; and (2) promulgate rules governing caseload and workload reporting requirements. I.C. § 19-850(1)(a) (2015).[6] Appellants allege their injuries are due, in part, to a "lack of ongoing training and professional development" for public defenders, and public defenders' crushing caseloads. They explain that many public defenders' caseloads are "well above national standards and impossible for one person to handle effectively." Appellants further allege that, despite the PDC's awareness that public defenders are receiving inadequate training while laboring under excessive caseloads and the PDC's responsibility to promulgate rules related to these issues, "no such rules have been promulgated to date." Although Respondents contend the PDC is not causally connected to Appellants' injuries because public defense has been delegated to the counties, Respondents overlook the fact that the PDC's rules, if promulgated, would bind the counties. *See* I.C. § 19-850(1)(a) (2015). Thus, Appellants' injuries—allegedly due, at least in part, to a lack of training and excessive caseloads—are fairly traceable to the PDC.

However, the PDC has no other power that would satisfy causation. The PDC's duties to make annual recommendations to the Legislature and to hold quarterly meetings are not causes of Appellants' injuries. Though Appellants emphasize that the PDC has failed to make any legislative recommendations, any legislative recommendations would be simply that—

---

[6] We observe that these same rulemaking duties still exist under the 2016 amendments. I.C. § 19-850(1)(a)(i)-(ii) (2016).

recommendations. The Legislature would not be obligated to respond to those recommendations in any particular way. *See Bennett*, 520 U.S. at 167 (stating that causation means the injury cannot be "the result of the independent action of some third party not before the court.").

We hold that causation as to the PDC is met because of its duty to promulgate rules governing training and caseload reporting requirements. The PDC's failure to promulgate these rules illustrates that Appellants' injuries are fairly traceable to the PDC.

(iii)   <u>Redressability</u>

Standing's redressability element ensures that a court has the ability to order the relief sought, which must create a substantial likelihood of remedying the harms alleged. *See Ciszek v. Kootenai Cnty. Bd. of Comm'rs*, 151 Idaho 123, 129, 254 P.3d 24, 30 (2011); *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982). Redressability requires a showing that "a favorable decision is *likely* to redress [the] injury, not that a favorable decision will *inevitably* redress [the] injury." *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994). However, it cannot be only speculative that a favorable decision will redress the injury. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Redressability and causation often overlap. *See, e.g.*, *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013). The concepts "are distinct insofar as causality examines the connection between the alleged misconduct and injury, whereas redressability analyzes the connection between the alleged injury and requested judicial relief. Redressability does not require certainty, but only a substantial likelihood that the injury will be redressed by a favorable judicial decision." *Id.* (citations omitted).

The complaint requests the following relief:

   A) Certify this case as a class action pursuant to Rule 23 of the Idaho Rules of Civil Procedure;

   B) Declare that the State of Idaho is obligated to provide constitutionally adequate representation to indigent criminal defendants, including at their initial appearances;

   C) Declare that the constitutional rights of Idaho's indigent criminal defendants are being violated by the State on an ongoing basis, and provide a deadline for the State to move this Court for approval of specific modifications to the structure and operation of the State's indigent-defense system;

   D) Enjoin the State from continuing to violate the rights of indigent defendants by providing constitutionally deficient representation;

   E) Enter an injunction requiring the State to propose, for this Court's approval and monitoring, a plan to develop and implement a statewide system of public

defense that is consistent with the U.S. Constitution and the Constitution and laws of the State of Idaho;

F) Enter an injunction that requires the State to propose, for this Court's approval and monitoring, uniform workload, performance, and training standards for attorneys representing indigent criminal defendants in the State of Idaho in order to ensure accountability and to monitor effectiveness;

G) Enter an injunction barring the use of fixed-fee contracts in the delivery of indigent defense services in the State of Idaho;[7]

H) Award Plaintiffs and the Class reasonable attorneys' fees and costs incurred during the course of this litigation pursuant to 42 U.S.C. § 1988, I.C. § 12-117, the Private Attorney General doctrine and other applicable law; and

I) Grant any other relief the Court deems necessary and proper to protect Plaintiffs and the Class from further harm.

The district court reasoned that "Plaintiffs ask this Court to basically intervene and supersede in every single case, and in every court and county and to then make a blanket determination that every indigent criminal defendant's rights are being violated." The district court found "[s]uch relief [was] too speculative . . . ." The district court did not conduct separate redressability analyses as to each defendant. We provide that analysis below.

(1)     State of Idaho

Redressability as to the State is satisfied. Ordering Appellants' requested relief against the State would create a substantial likelihood of remedying the injuries alleged because the State has the power—and indeed the responsibility—to ensure public defense is constitutionally adequate. Additionally, Appellants do not allege deficiencies in just a handful of counties. Rather, they allege "longstanding, statewide deficiencies in the Idaho system, which result in actual and constructive denial of counsel across the state." Given that the counties have no practical ability to effect statewide change, the State must implement the remedy.

Unlike the district court, we do not find Appellants' requested relief is too speculative. Were the requested relief ordered, the State would be obligated to create a plan to ensure public defense is constitutionally adequate. That plan would cover training standards and workload limits, which, as discussed, stand at the root of many of the injuries alleged. Entities tasked with providing and overseeing public defense would be bound by the State's plan. Because

---

[7] This request is moot. Idaho law prohibits the use of fixed-fee contracts, although that prohibition only applies to contracts "entered into or renewed on or after the effective date" of the 2014 legislation. I.C. § 19-859(4). Respondents explain that fixed-fee contracts were in place when that prohibition was enacted, but have since been phased out. While fixed-fee contracts are in the record, those contracts preceded the statutory prohibition.

15

Appellants' requested relief, if ordered against the State, would create a substantial likelihood of redressing Appellants' injuries, redressability as to the State is satisfied.

(2)    The PDC

In addition, redressability as to the PDC is satisfied. Set forth above are the PDC's duties as of the time when the complaint was filed. *See supra* Part V(B)(1)(a)(ii)(3). The PDC's duties, however, have since been expanded. *See* Act of July 1, 2016, S.L. 2016, ch. 195, § 1. The parties agree that redressability should be examined in light of these expanded duties. As Respondents concede, "[u]nder both Federal and State law, claims for injunctive or other prospective relief are adjudicated under the law in effect when the court decides the case, be the case before the trial court or an appellate court, because such relief operates *in futuro.*" *See, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 273 (1994) ("When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive."); *Adams Cnty. Abstract Co. v. Fisk*, 117 Idaho 513, 515, 788 P.2d 1336, 1338 (Ct. App. 1990) (noting that "the writ of mandate issued in this case is subject to prospective modification based on the 1989 statutory amendment," notwithstanding that the amendment was enacted after the action was filed). We conduct our analysis accordingly.

The Legislature amended Idaho's Public Defense Act, effective July 1, 2016, by expanding the PDC's authority and duties. *See* Act of July 1, 2016, S.L. 2016, ch. 195, § 1. Most notably, under the 2016 amendments, the PDC now has the duty to promulgate rules to ensure counties' public defense "is constitutionally delivered to all indigent persons in this state." I.C. § 19-850(1)(a)(vi) (2016). Additionally, the PDC itself can now remedy public defense shortcomings in each county if the PDC finds that the county "willfully and materially failed to comply with indigent defense standards." I.C. § 19-862A(11)(b) (2016). If the PDC finds that the county's material failure to comply with indigent defense standards was not willful, it can require the county to explain how the failure will be remedied. I.C. § 19-862A(11)(a) (2016).

Nevertheless, Respondents contend the PDC lacks any power to redress Appellants' injuries. We cannot agree. Ordering Appellants' requested relief against the PDC would create a substantial likelihood of remedying the injuries alleged. That is especially true in light of the 2016 amendments, as the PDC can promulgate rules to ensure public defense is constitutionally adequate and, moreover, can intervene at the county level. Yet, even analyzing redressability under the PDC's former powers shows that redressability is established. The 2016 amendments

16

do not alter the PDC's duty to promulgate rules governing (1) training requirements for public defenders; and (2) caseload and workload reporting requirements. I.C. § 19-850(1)(a)(i)-(ii). Appellants allege their injuries are caused, in part, by the PDC's failure to promulgate these rules. Were the PDC to exercise these powers, it would create a substantial likelihood of remedying the injuries alleged. As such, redressability is satisfied as to the PDC.

(b)     The "relaxed" standing analysis

In the alternative, Appellants argue they have standing under the "relaxed" standing analysis, which they contend does not inquire as to injury in fact, causation, or redressability. In *Coeur d'Alene Tribe v. Denney*, No. 43169, 2015 WL 7421342, at *4 (Idaho Nov. 20, 2015), this Court noted that it is willing to "relax ordinary standing requirements in other cases where: (1) the matter concerns a significant and distinct constitutional violation, and (2) no party could otherwise have standing to bring a claim." Thus, Appellants argue (1) the "right to counsel at issue in this case could not be more fundamental"; and (2) "[i]f [they] cannot bring this lawsuit, there will be no one to enforce this essential right against continued inaction and delay by the PDC and other government officials."

We disagree. Though violations of the right to counsel constitute significant and distinct constitutional violations, Appellants are not the only ones who could bring this lawsuit. In fact, the complaint alleges "the circumstances surrounding the named Plaintiffs' representations are not unique to them. Rather, they exemplify the experiences of thousands of indigent defendants across the State . . . ." Because any one of those "thousands of indigent defendants" could bring this lawsuit, Appellants do not satisfy the relaxed standing analysis.[8]

2.     Ripeness

In *State v. Manley*, 142 Idaho 338, 342, 127 P.3d 954, 958 (2005), we summarized ripeness as follows:

> The ripeness doctrine concerns the timing of a suit and asks whether a case is brought too early. The purpose of the ripeness requirement is to prevent courts from entangling themselves in purely abstract disagreements. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). Under the ripeness test in Idaho, a party must show (1) the case presents definite and concrete issues; (2) a real and substantial controversy exists (as opposed to hypothetical facts); and (3) there is a present need for adjudication. *Noh v. Cenarrusa*, 137 Idaho 798, 801, 53 P.3d

---

[8] Respondents argue the relaxed standing analysis implicates only the injury in fact component of standing, not causation or redressability. Our conclusion that Appellants could not satisfy the relaxed standing analysis even if it applied obviates the need to address this argument.

1217, 1220 (2002); *Miles v. Idaho Power Co.*, 116 Idaho 635, 642, 778 P.2d 757, 764 (1989).

"[I]n many cases, ripeness coincides squarely with standing's injury in fact prong." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 1999). The district court's analysis illustrates that point. The district court concluded Appellants' claims were not ripe largely for the same reasons it found that Appellants did not satisfy the injury in fact standard. Specifically, the district court reasoned that ripeness was not satisfied because "none of the Plaintiffs' criminal cases have concluded, no appeals have taken place, and no post-conviction relief has been sought." Similarly, the district court reasoned that an injury in fact was not demonstrated because "the Plaintiffs have not yet been convicted of any crime in their underlying cases, nor pursued or exhausted any appeal rights, nor any post-conviction relief."

Because the ripeness analysis differs as to the State and the PDC, we analyze each party separately.

(a)     State of Idaho

By undertaking case-by-case inquiries into Appellants' individual cases, the district court erroneously concluded the case was not ripe because Appellants "had not even pursued any appeal or post-conviction relief in their individual cases." That analysis was in error.

Appellants suffered ascertainable injuries by being actually and constructively denied counsel at critical stages of the prosecution, which they allege are the result of deficiencies in Idaho's public defense system. As a result, Appellants allege as follows:

> These constitutional and statutory deficiencies manifest themselves in myriad ways, including (1) failure to provide counsel to indigent defendants at their initial appearance; (2) extended and unnecessary pretrial detention; (3) excessive caseloads that far exceed national standards; (4) lack of sufficient investigation; (5) lack of sufficient expert analysis and testimony; (6) lack of consistent, effective, and confidential communication between indigent defendants and public defenders; (7) continued use of fixed-fee contracts for attorneys providing indigent-defense services; (8) lack of public-defender independence; (9) lack of sufficient training in the field of criminal defense; (10) lack of informed and consistent oversight of the provision of indigent-defense services throughout the State; and (11) lack of sufficient supervision and evaluation.

According to Appellants, "[e]ach of these deficiencies is directly linked to the State's longstanding and ongoing failure to provide the funding, supervision, and training necessary to meet its legal obligations in the area of indigent defense."

18

These allegations establish ripeness by illustrating that "(1) the case presents definite and concrete issues; (2) a real and substantial controversy exists (as opposed to hypothetical facts); and (3) there is a present need for adjudication." *See Manley*, 142 Idaho at 342, 127 P.3d at 958. Indeed, we note that Respondents do not contest that ripeness is met as to the State. Therefore, we hold that Appellants' claims against the State are ripe.

(b)     The PDC

Additionally, Appellants' claims against the PDC are ripe. *Manley's* first two ripeness requirements—definite and concrete issues and a real, substantial controversy—are met for the same reason those requirements are met against the State. However, Respondents contend there is no present need for adjudication due to the 2016 amendments to Idaho's Public Defense Act, which took effect after this action was filed. *See* Act of July 1, 2016, S.L. 2016, ch. 195, § 1. The record before us contains no evidence concerning the PDC's conduct in light of the 2016 amendments. Thus, Respondents argue "[n]othing in this record shows that the PDC will not carry out its new responsibilities."

Although Respondents are correct concerning the PDC's "new responsibilities," they overlook that the 2016 amendments leave in place the key parts of the PDC's original authority and duties it has had since its inception on March 26, 2014. The 2016 amendments do not alter the PDC's duty to promulgate rules governing (1) training requirements for public defenders; and (2) caseload and workload reporting requirements. I.C. § 19-850(1)(a)(i)-(ii). The PDC's alleged failure to exercise these two duties during the initial fourteen months of the PDC's existence is at the heart of many of Appellants' allegations.[9] As a result, there is a present need for adjudication. Accordingly, we conclude Appellants' claims against the PDC are ripe.

3.     Separation of powers

The final basis of the district court's order is the separation of powers doctrine. The separation of powers doctrine prohibits "judicial review of the discretionary acts of other branches of government." *In re SRBA Case No. 39576*, 128 Idaho 246, 261, 912 P.2d 614, 629 (1995). The separation of powers doctrine is "embraced in art. 2, § 1 of the Idaho Constitution. The question is whether this Court, by entertaining review of a particular matter, would be substituting its judgment for that of another coordinate branch of government, when the matter

---

[9] As noted, the record before us contains no evidence that the PDC has carried out its mandatory rulemaking duties. As alleged in Appellants' complaint, "no such rules have been promulgated to date." If the PDC were to take action, Appellants concede their claims against the PDC may fail for either mootness or lack of proof.

was one properly entrusted to that other branch." *Miles v. Idaho Power Co.*, 116 Idaho 635, 639, 778 P.2d 757, 761 (1989).

The complaint's prayer for relief can be simplified into a request for two main remedies: (1) a declaratory judgment that Idaho's public defense system is unconstitutional; and (2) an injunction requiring Respondents to fix it. Concluding the requested relief raised separation of powers concerns, the district court reasoned as follows:

> Plaintiffs do not argue that the statute delegating the duty to provide public defense is unconstitutional. They simply argue that the county commissioners in some or all of the counties, and the various systems of public defense, have failed to protect their constitutional rights to counsel and a fair trial. Instead of filing suit against those counties where they believe their constitutional rights have been violated, they brought this action against the State, the Governor, and the PDC. Plaintiffs also do not argue that the statute establishing the PDC is unconstitutional. They argue, instead, that the PDC is an ineffective and inadequate response by the legislature to redress the problem of inadequate or ineffective assistance of public defense counsel. Instead of seeking to have an act declared unconstitutional, they ask this Court to declare the inaction to be unconstitutional. Plaintiffs ask this Court to declare the whole system (or lack of system) to be unconstitutional and to then establish standards or guidelines, based on previous holdings of other courts, that the Governor, the PDC, the legislature, and all counties (whom they have not sued at this time), must follow. Plaintiffs ask this Court to mandate that the Governor and the PDC (and the legislature and counties) must enact as legislation, ordinances, or rules to meet those standards, and to provide adequate funding therefore. This Court does not have the power or jurisdiction to do so under the established principles of separation of powers imbedded in the federal and state constitutions.

We disagree. Our precedent instructs that the separation of powers doctrine is triggered when (1) a "textually demonstrable constitutional commitment" assigns the matter to a particular branch of government; or (2) the matter implicates another branch's discretionary authority. *See Miles*, 116 Idaho at 639–40, 778 P.2d at 761–62. For instance, in *Idaho Schools for Equal Educational Opportunity v. State (ISEEO IV)*, 140 Idaho 586, 594–97, 97 P.3d 453, 461–64 (2004), we held that a statute authorizing the judiciary to impose a levy violated the separation of powers doctrine because the Idaho Constitution commits the power to tax to the Legislature. Similarly, in *Diefendorf v. Gallet*, 51 Idaho 619, 638, 10 P.2d 307, 314–15 (1932), we held that the governor's discretion to define the "extraordinary occasions" under which Article 4, Section 9 of the Idaho Constitution permits special legislative sessions to be convened was a discretionary act exempt from judicial review.

Here, Appellants' requested relief does not implicate the separation of powers doctrine. The right to counsel, which Appellants seek to vindicate, is not entrusted to a particular branch of government. Nor does a particular branch of government merely have discretion to enforce the right to counsel, a fundamental right. *See Gideon*, 372 U.S. at 342–43. Respondents concede they lack discretion as to *whether* the right to counsel must be honored, but contend they have discretion as to *how exactly* that will be done. That argument misses the mark. Simply that Respondents will exercise some discretion when deciding which course of action to take so as to fulfill their affirmative duties does not implicate the separation of powers doctrine.

This conclusion is not altered even though Appellants ask the judiciary to retain jurisdiction to monitor Respondents' efforts to bring the public defense system into constitutional compliance. In *Idaho Schools for Equal Education Opportunity v. State (ISEEO V)*, 142 Idaho 450, 459, 129 P.3d 1199, 1208 (2005), we affirmed the declaratory judgment that Idaho's public school funding system was "simply not sufficient to carry out the Legislature's duty under the constitution" to "establish and maintain a general, uniform and thorough system of public, free common schools." Moreover, *ISEEO V* "retain[ed] jurisdiction to consider future legislative efforts to comply with the constitutional mandate to provide a safe environment conducive to learning so that we may exercise our constitutional role in interpreting the constitution and assuring that its provisions are met." *Id.* at 460, 129 P.3d at 1209. Similarly, in *Hellar v. Cenarrusa*, 106 Idaho 571, 576, 682 P.2d 524, 529 (1984), we affirmed the declaratory judgment invalidating the Legislature's reapportionment scheme, upheld the reapportionment plan that the district court itself had entered, and retained jurisdiction. Concurring in part and dissenting in part, Justice Shepard noted that, although the reapportionment "power does not belong to nor should it be exercised by, the judicial department of government, albeit if there be a legislative abdication of its power and duty, the courts will be required to act in the legislature's stead." *Id.* at 585, 682 P.2d at 538 (Shepard, J., concurring part and dissenting in part). Other jurisdictions have fashioned similar relief. *E.g.*, *Washakie Cnty. Sch. Dist. No. One v. Herschler*, 606 P.2d 310, 337 (Wyo. 1980) (remanding public school financing case to district court with instructions to "retain jurisdiction until a constitutional body of legislation is enacted and in effect, taking such action as may be necessary to assure conformity").

Respondents consistently assume that granting relief would require legislative action. This, too, misses the mark. Appellants do not challenge the statutes creating the PDC or

delegating public defense to the counties. Instead, Appellants challenge Respondents' inaction, and part of that inaction includes failures to comply with statutorily mandated duties. Thus, Appellants' requested relief does not ask the judiciary to order the Legislature to do anything. The New York Court of Appeals addressed a similar argument in *Hurrell-Harring v. New York*, 930 N.E.2d 217, 227 (N.Y. Ct. App. 2010), when holding that the class of plaintiffs could sue for alleged public defense inadequacies. As *Hurrell-Harring* explained:

> It is, of course, possible that a remedy in this action would necessitate the appropriation of funds and perhaps, particularly in a time of scarcity, some reordering of legislative priorities. But this does not amount to an argument upon which a court might be relieved of its essential obligation to provide a remedy for violation of a fundamental constitutional right.

*Id.* The same logic applies here. Merely that it is possible that Idaho's three branches of government may collaborate when deciding how to ensure our public defense system passes constitutional muster does not raise separation of powers concerns. Thus, Appellants' claims do not implicate the separation of powers doctrine.

## C.    Are Appellants entitled to attorney fees on appeal?

Appellants seek attorney fees on appeal under both Idaho's private attorney general doctrine and 42 U.S.C. § 1988. As to the private attorney general doctrine, this Court has explained that:

> [A] three-factor test [is] to be considered in awarding attorney's fees under the private attorney general theory: "(1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, (3) the number of people standing to benefit from the decision." *These factors indicate that there must be some resolution of the substantive issues before a decision on attorney fees can be reached.*

*Idaho Sch. for Equal Educ. Opportunity v. Idaho State Bd. of Educ. (ISEEO II)*, 128 Idaho 276, 285, 912 P.2d 644, 653 (1996) (emphasis added).

As to 42 U.S.C. § 1988, "[a] plaintiff 'prevails' for purposes of § 1988 'when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.' " *Higher Taste, Inc. v. City of Tacoma*, 717 F.3d 712, 715 (9th Cir. 2013) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992)).

Although Appellants prevail in part on appeal, they are not entitled to fees. The merits of Appellants' claims still need to be addressed.

## V.     CONCLUSION

We reverse the dismissal of Appellants' complaint as to the State of Idaho and the PDC, but affirm dismissal as to Governor Otter. We remand this case for further proceedings consistent with this opinion. We do not award attorney fees or costs on appeal.

Justices EISMANN, W. JONES, HORTON, and BRODY, **CONCUR.**