# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48276

CRAIG MARSHALL BERGLUND and
KRISTI ANNE BERGLUND, husband and
wife; MARY KAYE BROWN, an individual,

    Plaintiffs-Respondents,

and

SCOTT CHESER and DAWN CHESER,

    Real Parties in Interest-Respondents,

v.

BRIAN DIX,

    Defendant-Appellant,

and

DOES I through X,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, November 2021 Term

Opinion filed: June 6, 2022

Melanie Gagnepain, Clerk

Appeal from the District Court of the Third Judicial District of the State of Idaho, Gem County. George A. Southworth, District Judge.

The judgment of the district court <u>affirmed in part</u> and <u>reversed in part</u>.

Mooney Wieland, PLLC, Boise, for Appellant. Carl Withroe argued.

Borton-Lakey Law and Policy, Meridian, for Respondents. Victor Villegas argued.

---

MOELLER, Justice.

This appeal arises from a dispute between neighbors over a locked gate placed across a road subject to easement rights. Respondents Craig and Kristi Berglund and Mary Kaye Brown, then owners of the dominant estates, sued Brian Dix, who placed the gate on his property, the servient estate. The district court granted the Respondents' motion for summary judgment and ordered the gate removed from Dix's property. Dix appealed.

1

Before this Court heard the appeal, the Berglunds and Brown both sold their real property to different third parties. On appeal, Dix argued that this case was moot because Respondents no longer had standing to assert their rights under the easement. Thus, Dix contends, the district court's order should be vacated. In the alternative, Dix argued that the district court erred when it granted summary judgment. Dix also argued that the district court erred when it awarded attorney fees to the Respondents. We affirm in part and reverse in part.

## I.     FACTS AND BACKGROUND

### A. Factual Background

On February 28, 2003, Brian Dix ("Dix") purchased real property in Gem County, Idaho. The property is subject to a non-exclusive "ingress, egress and utility easement under, over and across a strip of land lying 50.00 feet south of and adjacent to" Dix's northern property boundary line. This easement is known as "Palomino Lane."

Mary Kaye Brown ("Brown") and her husband purchased a parcel located along Palomino Lane on April 15, 2004. The warranty deed contains "a non-exclusive right of way for a perpetual ingress, egress and utility easement." The Brown property was later transferred by quitclaim deed to the Alan and Mary Kaye Brown Trust of which Mary Kaye Brown is the surviving Co-Trustee and beneficiary.

In 2017, the property owners along Palomino Lane consisted of Dix and his wife, Brown, and three sets of neighbors—Marc and Paula Marcelin, Scott and Reiza Crager, and Roger and Patricia Kenyon. The Marcelins, Cragers, Kenyons, and Dixes agreed to install a gate across the entrance to the easement on Dix's property in response to concerns of trespassers and vandalism. Brown was not involved in the conversations that resulted in this agreement. Dix states that Roger Kenyon ("Mr. Kenyon") tried several times over a four-week period to contact Brown, but she never responded. Dix maintains that after the installation, Mr. Kenyon sent Brown the gate lock combination. However, Brown states she did not receive the combination. The district court found that all neighbors except Brown were given the combination.

In Mr. Kenyon's affidavit, he stated, "[the] limited purpose [for the gate] was if all of us property owners on Palomino Lane were gone, we would close the gate and wrap a chain around it." It is unclear when the gate was locked or closed after it was installed. Dix states that from the time it was installed, the gate was generally locked at night and unlocked during the day. However, Brown and the Kenyons state that until 2019, the gate was never kept locked or even closed except

2

for a few occasions on which the gate was closed when all property owners were gone. The district court found that the gate initially remained mostly open and unlocked.

Kristy and Craig Berglund (collectively, the "Berglunds") purchased the Marcelins' property in January 2018 but did not move in until August 2018. The Berglunds' warranty deed also contained "a non-exclusive right of way for a perpetual ingress, egress and utility easement." It is unclear when the Berglunds became aware of the existence of the gate. In his affidavit, Craig Berglund stated that he and his wife were not made aware of the gate until after they moved in, despite having seen the property prior to their purchase. However, in their depositions, the Berglunds stated that they drove through the gate twice before purchasing the property. Mr. Berglund stated that he spoke to the realtor regarding the easement because he noticed the gate when he was purchasing the property. Ms. Berglund stated, in her deposition, that she did not notice the gate until after moving in. Regardless, they testified that the gate was open both times they visited the property.

Beginning in March 2019, disputes arose among the property owners on Palomino Lane regarding the status of the gate and whether it should be kept closed or locked. Sometime after the Berglunds moved in, Dix began closing and locking the gate. The Berglunds maintain that the gate was not locked until March 2019. Ms. Berglund, in her deposition, testified that she was "absolutely positive" the first time she received the lock combination was March 2019. However, Dix provided a screenshot of a text message sent on May 20, 2018, from Elise Dix ("Ms. Dix") to Kristi Berglund ("Ms. Berglund") with the combination.

Late one night in early March 2019, an unknown car drove down Palomino Lane. Two days later, upon noticing unknown people wandering around the property, Ms. Dix locked the gate. She sent a text to Ms. Berglund to inform her that the gate was locked. Ms. Berglund responded "Ok." A few days later, Ms. Berglund requested a chain be wrapped around the gate but that it not be locked. She expressed difficulty reading the numbers and that it was taking her too long to unlock. The Dixes agreed, but said that they wanted the gate locked if issues arose again. Ms. Berglund agreed, replying "Ok thank you." On March 17, Ms. Berglund found the gate locked and assumed the Dixes had locked it. That same day, Ms. Dix informed Ms. Berglund that the Kenyons had locked it. On March 29, Ms. Berglund messaged Ms. Dix and notified her that the gate should be left open to allow emergency vehicles access. Ms. Berglund also stated that the fire chief determined the gate could only be locked if there was a box with a key in it that the fire department

3

could use to open it. Ms. Dix ordered a fire department approved lock which arrived mid-April. Mr. Berglund provided images and stated that on at least two occasions, the fire lock was present but improperly locked in such a way that even if the fire department opened their lock, the gate would remain locked.

In early April 2019, Dix, the Berglunds, and Mr. Kenyon met to attempt to resolve the issue of the gate. Mr. Berglund sent Dix information regarding an electric gate. Dix agreed to consider the electric gate, but they never discussed it again. Mr. Berglund stated that he was under the impression Dix had no interest in an electric gate because he did not respond to Mr. Berglund.

Ms. Kenyon, in her affidavit, recounts an experience on April 20, 2019, when she made multiple trips to and from her property without closing the gate. Dix requested she close the gate. According to the Kenyons, Dix blocked her vehicle with his. She refused to close and lock the gate and called the Sheriff. Dix claims Ms. Kenyon refused to close the gate after the deputy asked her to shut it.

Starting in April 2019, Ms. Berglund repeatedly removed the gate locks and threw them onto Dix's property. In her deposition, Ms. Berglund states she stopped throwing the locks after she "got with [her] attorney" in May 2019. Dix asserts Ms. Berglund continued to throw the locks through June 2019. The Berglunds also admitted to driving around the gate after filing their suit.

The Berglunds state that the gate has interfered with their use and enjoyment of their land. They assert that since the gate has been locked, they have not received trash service and have had to take their trash to a neighbor's home on the road that intersects with Palomino Lane. The Berglunds also claim that they had not received mosquito abatement service after the gate was locked at all times. The Berglunds further complain that parcels too large to fit in their mailbox have been left outside the gate instead of delivered to their front door. Dix has a parcel receiving box outside the gate near the mailboxes, and he claims that he has offered to all neighbors the use of this receiving box with none taking him up on the offer. However, the Berglunds assert the box only has Dix's address and that they have not been given permission to use it.

### B. Procedural Background

The Berglunds filed a Complaint against Dix on May 15, 2019. On July 11, 2019, the district court permitted the Berglunds to amend their complaint to add Brown as a plaintiff. The Berglunds and Brown (collectively, the "Respondents") sought a preliminary and permanent

injunction requiring Dix to remove the gate from his property or leave it open at all times. The Respondents also requested attorney fees.

Five days prior to the Berglunds amending their complaint to add Brown as a plaintiff, there was an incident between Brown and Dix recorded in an incident summary by the Gem County Sheriff's Office. According to the report, Brown stated that she had been locked out by a neighbor. She told the deputy that she had not been given a key or code but admitted that she had never asked for one. Dix provided the deputy with the code to give to Brown. Dix told the deputy she had been sent the code in a text message two years prior.

The district court granted the Respondents' motion for a preliminary injunction, ordering that the gate remain open and unlocked. The Respondents then filed a motion for summary judgment, which the district court granted. The district court entered a judgment requiring the gate be left open and removed within 60 days. Dix filed a motion to reconsider or amend judgment. On September 11, 2020, the district court issued an amended judgment, which again ordered Dix to remove the gate within 60 days and permanently enjoined him from blocking and otherwise interfering with Respondents' use of the easement. The Respondents were awarded $32,000.00 in attorney fees.[1]

On August 18, 2020, the Berglunds sold their property. Dix filed a notice of appeal on August 28, 2020. On September 17, 2020, Brown, as Trustee of the Alan and Mary Kaye Brown Trust, also sold her property.[2] On September 28, 2020, Dix filed a motion to stay enforcement and execution of the amended judgment, which the district court denied. In his motion to stay enforcement and execution, Dix argued that the Respondents had lost their standing in this case by selling their properties; however, Dix did not seek relief under Idaho Rule of Civil Procedure 25(c). Dix then filed an amended notice of appeal on September 23, 2020, and a second amended notice of appeal on October 22, 2020.

Dix filed a "Suggestion of Mootness" with this Court on September 28, 2020, arguing that by selling their properties, the Respondents no longer had standing to defend the amended judgment on appeal. This Court declined to act on the Suggestion of Mootness, until the record and further briefing were available. During oral argument on November 8, 2021, Respondents conceded that because they had sold their dominant estates, which are the subject of this appeal,

---

[1] Respondents were also awarded $602.14 in costs; however, Dix has only appealed the award of attorney fees.
[2] The Kenyons are not party to this suit but have also sold their property along Palomino Lane.

they are no longer real parties in interest as to the easement. However, Respondents maintained that they still had an interest in defending the award of attorney fees below.

Following oral argument, on November 29, 2021, this Court ordered Respondents to notify the current owners of the real property, formerly owned by the Berglunds and Brown, of the status of this matter. Respondents notified Chris and Erin Bustos (collectively, the "Bustoses"), who purchased the Berglunds' property, and Scott and Dawn Cheser (collectively, the "Chesers"), who purchased Brown's property. The Chesers filed a notice of substitution of party for Mary Kaye Brown on December 2, 2021, stating their willingness to stand upon the briefing and arguments already made by the Berglunds' and Brown's attorney. In response, Dix filed a motion to disallow substitution of Scott and Dawn Cheser. The Chesers responded to Dix's motion to disallow on December 30, 2021. The Bustoses have not attempted to substitute in for the Berglunds.

## II.     STANDARDS OF REVIEW

Mootness and standing are doctrines related to justiciability. *Westover v. Idaho Cntys. Risk Mgt. Program*, 164 Idaho 385, 389, 430 P.3d 1284, 1288 (2018). "[J]usticiability doctrines implicate jurisdiction." *Frantz v. Osborn*, 167 Idaho 176, 179, 468 P.3d 306, 309 (2020) (quoting *Tucker v. State*, 162 Idaho 11, 18, 394 P.3d 54, 61 (2017)). "Jurisdictional issues, like standing, are questions of law, over which this Court exercises free review." *Id.* (quoting *In re Jerome Cnty. Bd. Of Comm'rs*, 153 Idaho 298, 308, 281 P.3d 1076, 1086 (2012)). "[B]ecause the issues of standing and mootness are jurisdictional, they can be raised at any time, including for the first time on appeal. This Court also has a duty to raise the issues of standing and mootness sua sponte." *Arambarri v. Armstrong*, 152 Idaho 734, 738, 274 P.3d 1249, 1253 (2012) (internal citations omitted).

"The standard of review on appeal from an order granting summary judgment is the same standard that is used by the district court in ruling on the summary judgment motion." *Hoke v. Neyada, Inc.*, 161 Idaho 450, 453, 387 P.3d 118, 121 (2016). Under Idaho Rule of Civil Procedure 56(a), a court "must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The court "must liberally construe facts in the existing record in favor of the nonmoving party, and draw all reasonable inferences from the record in favor of the nonmoving party." *State v. Rubbermaid, Inc.*, 129 Idaho 353, 355, 924 P.2d 615, 617 (1996). "If there are conflicting inferences contained in the record or if reasonable minds might reach different conclusions, summary judgment must be

denied." *Knudsen v. J.R. Simplot Co.*, 168 Idaho 256, 364, 483 P.3d 313, 321 (2021). However, "[w]here the case will be tried without a jury, 'the trial court as the trier of fact is entitled to arrive at the most probable inferences based upon the undisputed evidence properly before it and grant the summary judgment despite the possibility of conflicting inferences.' " *Borley v. Smith*, 149 Idaho 171, 176–77, 233 P.3d 102, 107–08 (2010) (citing *P.O. Ventures, Inc. v. Loucks Family Irrev. Trust*, 144 Idaho 233, 237, 159 P.3d 870, 874 (2007)).

"This Court applies an abuse of discretion standard when reviewing a district court's award of attorney fees, and the party appealing an award of statutory fees bears the burden of demonstrating a clear abuse of discretion." *Berkshire Investments, LLC v. Taylor*, 153 Idaho 73, 80, 278 P.3d 943, 950 (2012).

> When this Court reviews an alleged abuse of discretion by a trial court the sequence of inquiry requires consideration of *four* essentials. Whether the trial court: (1) correctly perceived the issue as one of discretion, (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.

*Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

"When a judgment on appeal reaches the correct conclusion, but employs reasoning contrary to that of this Court, we may affirm the judgment on alternate grounds." *Martel v. Bulotti*, 138 Idaho 451, 454–55, 65 P.3d 192, 195–96 (2003).

### III.    ANALYSIS

**A. Scott and Dawn Cheser are permitted to substitute for Brown.**

Dix has argued that this case is moot because the Berglunds and Brown sold their properties, forfeiting their rights to use the easement. Although Dix has couched this issue in terms of "mootness," he actually raises a different aspect of justiciability—standing. Berglund and Brown have conceded that they are no longer the real parties in interest as to the easement at the heart of this case. Inasmuch as they clearly lack standing to defend the judgment they were granted below, except for their award of their attorney fees, Respondents should have complied with Idaho Appellate Rule 7, which sets forth the procedure when a transfer of interest occurs during the pendency of an appeal:

> Upon the death or disability of a party to a proceeding governed by these rules, *or upon the assignment, transfer*, or the accession to the interest or office of party to a proceeding governed by these rules by another person, *the representative, or successor in interest of such party shall file a notification of substitution of party*

7

*and serve the same on all parties to the proceeding or appeal.* The substitution shall be effective unless an objection thereto is made within fourteen (14) days of service, by a motion to disallow such substitution, in the manner provided for motions under Rule 32.

(Emphasis added).

Because the record before us was unclear whether Respondents' successors-in-interest were even aware of the underlying lawsuit or appeal, following oral argument we issued an Order pursuant to Idaho Appellate Rule 7 requiring the real parties-in-interest to be identified by Respondents, notified of the status of this case, and substituted as parties. The Chesers filed a notice of substitution, to which Dix objected. The Chesers responded to Dix's objection. Dix argues that the Chesers cannot be substituted as parties because (1) Brown's claims did not survive the transfer of her property to the Chesers, and (2) the Chesers' ownership of the Brown property does not reestablish a justiciable controversy. We disagree with Dix's assertions and permit the Chesers to be substituted as the real parties in interest.

Dix acknowledges that Brown's claims arose from her ownership of property to which the easement was appurtenant. However, he argues that Brown's claimed injury was unreasonable interference with her rights of ingress and egress and the evidence she relied on was specific to Brown, not the property. Therefore, Dix claims that Brown's claim evaporated upon transfer of the property to the Chesers. While easements in gross are a personal interest, an appurtenant easement runs with the land and "is incapable of existence or separation from that dominant estate." *Lorenzen, Trustee of Phyllis E. Lorenzen Revocable Trust v. Pearson*, 167 Idaho 385, 393, 470 P.3d 1194, 1202 (2020). Here, since the easement benefits run with the dominant estate, the Chesers have an appurtenant easement and may continue to assert and defend Brown's claim in this appeal, the determination of which affects their ingress and egress rights. Brown's claim was not founded upon her rights as an individual, but rather upon the rights attached to her property. The Chesers are now the real parties-in-interest and have a right to continue Brown's claim. *See* I.A.R. 7, I.R.C.P. 25(c), I.R.C.P. 25(e); *see also*, *Thornton v. Pandrea*, 161 Idaho 301, 318, 385 P.3d 856, 873 (2016) (holding the district court did not err by allowing subsequent owner of dominant estate to substitute in).

Dix also argues that the Chesers have only met one prong of standing because, although they have established rights to the easement, they have not established a redressable injury. Again, since the benefit of the easement runs with the property, a gate that hinders the Chesers ingress

and egress, which the district court found to be unreasonable, does constitute a redressable injury to the Chesers, as Brown's successors-in-interest. Therefore, inasmuch as the Chesers have standing and are permitted by Idaho law to substitute into this appeal in place of Brown, we allow the Chesers to continue with this appeal in place of Brown as to all matters before the Court. Brown and the Berglunds may remain in this case, but only for the purpose of defending the judgment granting them attorney fees in the underlying action. Likewise, although the Bustoses have not been formally substituted for the Berglunds, for the reasons set forth above, the results of this appeal as to the merits of this case will be equally applicable to them as the Berglund's successors-in-interest.

**B.  We reverse the district court's finding that the gate was per se unreasonable under *Johnson v. Highway 101 Investments*; however, we affirm the district court's decision to grant summary judgment based on its finding the gate was unreasonable under the circumstances presented in this case.**

Dix argues that summary judgment was improper because (1) the court misapplied the law in determining the gate was per se unreasonable, (2) the court failed to address Dix's defenses, and (3) the court failed to resolve disputed facts in favor of Dix. We will address each argument below.

### 1.  *We reverse the district court's finding that the gate was per se unreasonable.*

In *Johnson v. Highway 101 Investments, LLC*, this Court held that "a permanent structure is per se unreasonable if it diminishes an easement with a definite location and dimensions." 156 Idaho 1, 3, 319 P.3d 485, 487 (2014). The Respondents argued, and the district court agreed, that the gate at issue is per se unreasonable pursuant to this Court's holding in *Highway 101 Investments* because it is a permanent structure located within the dimensions of an express easement.

In *Highway 101 Investments*, the plaintiffs possessed the dominant estate with rights to a 25-foot-wide express easement for ingress and egress over the servient estate. *Id.* at 2, 319 P.3d at 486. The defendant, owner of the servient estate, installed a signpost and two bollards, effectively reducing the easement width from 25 feet to 19 feet at one point. *Id.* The district court applied the general standard of reasonableness which is the prohibition of unreasonable interference of the dominant estate owner's rights by the servient estate owner. The district court "held that Idaho law gives servient estate owners the right to use their land, but forbids them from unreasonably burdening the privileges of dominant estate owners." *Id.* Since plaintiffs did not provide testimony that the sign prevented them or their customers from accessing their store, "the district court concluded that [the defendant's] placement of the sign did not unreasonably interfere with [the

plaintiffs'] use of American Street as a right-of-way" and granted summary judgment in favor of the defendant. *Id.* However, on appeal, this Court departed from this general rule of reasonableness and looked to "a majority of our sister states [which] recognize a caveat to the general rule of reasonableness: a permanent structure is per se unreasonable if it diminishes an easement with definite location and dimensions." *Id.* at 3, 319 P.3d at 487. This Court accepted this majority approach "[b]ecause it provides a clear, bright-line standard [that] will avoid costly and time-consuming litigation concerning whether the servient estate owner's use of the easement area is reasonable." *Id.* at 4, 219 P.3d at 488.

Importantly, the structures at issue in *Highway 101 Investments* (a signpost and bollards) differ significantly from the gate at issue here. Gates, by their inherent nature can be opened or closed, and locked or unlocked. Thus, it cannot truly be said that all gates constitute a "permanent" obstruction to an easement. *Id.* at 3, 319 P.3d at 487. Depending on how a gate is placed and managed, it may not permanently diminish an easement. Among the circumstances to be considered is the necessity for the gate and the amount of interference it actually causes. Additionally, whether the gate was permanently locked, when it was locked, and what procedures were necessary to unlock it, are all circumstances that should be considered. In sum, we conclude that it is not per se unreasonable to place a gate along an easement—the specific circumstances of its placement and use must first be considered. This is consistent with Idaho law prior to 2014 when *Highway 101 Investmenst* was decided. *See*, *e.g.*, *Lovitt v. Robideaux*, 139 Idaho 322, 328, 78 P.3d 389, 395 (2003) ("According to this Court's decisions, the owner of a servient estate may construct a gate across an easement to limit use of the easement to only those who have a right to use it. Use of a gate, or any other method of regulating an easement, by the owner of the servient estate must, however, be reasonable." (Internal citations omitted)).

In the case at hand, the parties do not dispute that the easement was a 50-foot-wide express easement for ingress and egress along Palomino Lane. Dix and Mr. Berglund both acknowledged that while the easement is 50 feet wide, the actual gravel road used for access is approximately 20 feet wide. According to the survey conducted by Jeremiah Fielding, while the gate structures partially lie outside the approximately 20-foot-wide gravel road, they lie entirely within the boundaries of the 50-foot-wide easement. The district court granted summary judgment concluding there was no dispute of material facts and the gate was per se unreasonable.

Unlike the sign in *Highway 101 Investments*, which permanently reduced the size of the roadway from 25 to 19 feet, there was no finding that the gate in the case at hand permanently obstructs use of the roadway. While it is undisputed that the road is approximately 20 feet wide, the gate only obstructs use of the roadway when it is closed and locked. However, when the gate is open, it does not block or diminish the dominant estate owners' ability to use the road. The Berglunds and Browns never asserted that the gate impeded them when it was open. For these reasons, we decline to apply our holding in *Highway 101 Investments* to the gate in question here, as well as other structures that do not permanently impair an easement.

## 2. *We affirm the district court's decision to grant summary judgment based on a finding that the use and operation of the gate was unreasonable.*

In granting summary judgment, the district court found that even if the gate was not "per se unreasonable," it was still unreasonable under the circumstances of this case. Dix argues the granting of summary judgment was improper because there were disputed material facts, these disputed facts were improperly resolved against him, and his defenses were not considered. We agree with Dix that the district court erred when it failed to consider his affirmative defenses. However, although the district court did not expressly address Dix's defenses, this error is harmless because the current posture of this case renders them irrelevant. Dix's defenses applied specifically to the actions of Berglunds' and Brown, but they are no longer the real parties-in-interest. Since the Chesers are now the real party-in-interest, to have any impact on the outcome of this case, Dix's affirmative defenses must apply to the Chesers. Additionally, while the disputed facts in the record pertain to these defenses, they have been rendered irrelevant and immaterial since the newcomers' easement rights are not bound by the prior actions of their predecessors and the unrecorded agreements of their neighbors. We conclude that the failure to consider Dix's defenses did not affect the outcome of this case since Dix's defenses applied specifically to the Berglunds' and Brown's actions.

For the reasons explained in the prior section, we continue to apply the general standard of reasonableness when assessing whether the servient estate owner may place a gate over an easement. As noted above, this has long been the rule in Idaho:

> According to this Court's decisions, the owner of a servient estate may construct a gate across an easement to limit use of the easement to only those who have a right to use it. *Marshall v. Blair*, 130 Idaho at 682, 946 P.2d at 982 (citing *Gibbens v. Weisshaupt*, 98 Idaho 633, 570 P.2d 870 (1977); *Wood v. Brown*, 108 Idaho 739, 702 P.2d 777 (1985)). Use of a gate, or any other method of regulating an easement, by

11

the owner of the servient estate must, however, be reasonable. *See Wood v. Brown*, 108 Idaho at 742, 702 P.2d at 780.

*Lovitt*, 139 Idaho at 328, 78 P.3d at 395. "Even where reasons of substance justify maintaining a gate across a roadway easement, they may be outweighed by the inconvenience suffered by the owner of the dominant estate." Am. Jur. 2d Easements and Licenses, *Gates* § 77 (2021).

In granting summary judgment, the district court determined that the Berglunds and Brown had proven the gate, as used and operated by Dix, was unreasonable:

> A continuously locked gate unreasonably interferes with social visits, deliveries, housekeeping and maintenance contractors, shared transportation, food delivery, child transportation to and from school and various other activities, emergency visits, and countless other reasons anyone has to visit someone else's home. It unreasonably interferes with the property owner's use as well, requiring them to get out of their car, unlock the gate, drive through the gate, then get out of the car again, lock the gate back up, and drive away. That requirement is an unreasonable burden not only to the owners who rarely leave their house, but especially to those with limited mobility or busy households that come and go multiple times per day.

The district court based this holding on a number of undisputed facts, including: (1) the Respondents' inability to receive mail, packages, and trash service; (2) Dix's threatening to stop trash services, mail, and mosquito abatement if neighbors did not comply; (3) Dix's blocking of Ms. Kenyon's vehicle when she refused to close the gate; (4) Brown not receiving the combination when the gate was installed; and (5) Mr. Berglund's "undue burden [using the gate] because of a physical disability due to a knee replacement that affects his mobility." The district court also noted that Dix's argument that the gate was meant to contain his horses is unreasonable because there are gaps around the gate large enough for cars to pass through. The district court concluded: "The gate is not for the purpose of keeping livestock contained, or to prevent property damage or trespass on the servient estate, any more than any open dirt road in the county. *The more apparent purpose of this lock is spite and control*." (Emphasis added). This is consistent with our pre-*Highway 101 Investments* decisions that focused on the how a contested gate was used. *See Lovitt*, 139 Idaho at 328–29, 78 P.3d at 395–96 ("[T]he [defendants'] use of a gate across the easement was unreasonable and unduly restrictive under the circumstances because the [defendants] chose to begin using the gate in an effort to spite the [plaintiffs].").

Since the remedy sought in this case is injunctive, and the case would have been tried without a jury, the district court was not required to draw all inferences in favor of the non-moving party. Instead, it could rely on "the most probable inferences based upon the undisputed evidence

properly before it and grant the summary judgment despite the possibility of conflicting inferences." *P.O. Ventures*, 144 Idaho at 237, 159 P.3d at 874. However, even if we liberally construed the facts in the record and drew all inferences in favor of Dix, we would still conclude that the district court did not err in granting summary judgment. We acknowledge that facts specific to the previous owners—such as Mr. Berglund's physical disability, Brown not receiving the combination, Dix blocking Ms. Kenyon's car, and the spiteful motive—cannot be relied upon for a determination of unreasonableness now that ownership of the dominant estates have transferred to the Chesers and Bustoses. Yet, the remaining facts, which apply to all neighbors on Palomino Lane—such as the interference with delivery of mail and parcels, trash service, and mosquito abatement—are more than sufficient for us to affirm the district court's conclusion that Dix's use and operation of the gate is unreasonable. Further, the district court's inference that a constantly locked gate unreasonably interfered with "social visits, deliveries, housekeeping and maintenance contractors, shared transportation, food delivery, child transportation to and from school and various other activities, emergency visits, and countless other reasons anyone has to visit someone else's home" was permissible. Therefore, we affirm the district court's decision granting summary judgment on the grounds that the use and operation of the gate unreasonably interfered with the dominant estate owners' rights to the easement.

We recognize that there are some disputed issues of fact in the record that may apply to the affirmative defenses; however, the issue is whether they are *material* issues of fact. For example, Dix asserted he offered to allow the neighbors use of his parcel receiving box. He claimed Mr. Berglund had given Brown the combination as soon as the gate was installed. He showed evidence that he had purchased additional locks to address concerns of the Berglunds (such as a lock with bigger numbers when Ms. Berglund stated she could not read the numbers). Additionally, Dix asserts the Respondents have failed to show evidence of the gate not fulfilling his purpose. For example, the Berglunds have not shown that the gate failed to keep out trespassers, whereas Dix presented evidence of two instances of trespassers entering when the gate was not locked. While the district court made the finding that "it is clear that initially, the gate was kept mostly open and unlocked until the Berglunds moved in," Dix testified that it was unlocked during the day, but closed and locked almost every night from the time the gate was installed. While these facts may be in dispute, they are not material; they are only relevant to Dix's defenses against the Berglunds

13

and Brown. Inasmuch as the Berglunds and Brown have sold their properties, the defenses would be inapplicable on remand against the current parties in interest.

Additionally, we note that the affirmative defenses include waiver, laches, and estoppel. All of these defenses relate to the existence of an oral agreement. Again, while we agree with Dix that his defenses should have been addressed by the district court, we do not vacate on this ground because (1) any agreement to the installation or presence of the gate, whether made expressly or by acquiescence on the part of the Berglunds or Brown is now immaterial, and (2) even if such agreement were somehow binding upon the Berglunds or Brown, it is an unrecorded oral agreement that does not run with the land and cannot bind the parties' successors-in-interest.

Although the Marcelins, Kenyons, Cragers, and Dixes apparently agreed to install a gate in 2017, Brown did not participate in the discussions leading to this agreement, nor did she voice her opposition to the agreement. Dix argued that the defense of laches prohibited Brown from joining the action because she had known of the agreement to install the gate and did not complain of the gate until joining the Berglunds' lawsuit. Dix also argued that the Berglunds were estopped from bringing the action because the Marcelins, who sold their property to the Berglunds, had agreed to the installation of the gate and the Berglunds knew of the gate when they bought the property. As previously noted, Idaho law permits the servient estate owner to install a gate across an easement, so long as the gate does not unreasonably interfere with the rights of the dominant estate owners. *Lovitt*, 139 Idaho at 328, 78 P.3d at 395. Thus, the real issue in this case is not whether the gate was permitted to exist across the easement based on an oral agreement of some of the property owners; rather, the issue is whether the gate itself, or its use and operation, unreasonably interferes with the dominant estate owners' use of the easement. No alleged agreement gives Dix the right to unreasonably interfere with the dominant estate owners' use of the easement, whether they be the prior owners or their successors-in-interest. Therefore, any disputed facts as to the affirmative defenses are not material and the defenses are no longer applicable.

As discussed, this gate, as used and operated by Dix, has proven to be unreasonable. The right of the dominant estate owner to use an easement without unreasonable interference runs with the land. Therefore, when the Berglunds purchased the Marcelins' property, they remained unaffected by the Marcelin's oral agreement and could enforce their rights to use the easement without unreasonable interference. Similarly, when the Bustoses and Chesers purchased the

Berglunds' and Brown's properties, they acquired the right to use Palomino Road without unreasonable interference through the same express easement. So, even if Dix's affirmative defenses had merit against the Berglunds' and Brown's claims, they are not relevant in opposing the Chesers' or the Bustoses' claims.

Although mistakenly ignored by the district court, Dix's affirmative defenses have no bearing on the legal status of the recorded easement granted to the Bustoses and Chesers. Therefore, we affirm the district court's decision granting summary judgment on the alternate grounds that the gate is unreasonable.

### C. The district court's award of attorney fees to Respondents is reversed.

Dix has challenged the award of attorney fees below. He argues the district court abused its discretion by improperly awarding attorney fees under Idaho Code section 12-121 and Idaho Rule of Civil Procedure 54(e). The portion of the amended judgment awarding Respondents attorney fees is personal to the Berglunds and Brown. Therefore, they still have standing to defend that portion of the judgment before this Court, notwithstanding their loss of standing as to all other issues.

In *Smith v. Smith*, 160 Idaho 778, 379 P.3d 1048 (2016), although we determined that the merits of the primary issue on appeal was moot, we nonetheless considered the issue of attorney fees because the prevailing party below still had an interest in the attorney fees judgment awarded them by the trial court. *See also Miller v. Board of Trustees*, 132 Idaho 244, 970 P.2d 512 (1998). Here, although Respondents no longer have standing regarding the merits of this case, they are permitted to defend the judgment awarding them attorney fees.

"In any civil action, the judge may award reasonable attorney fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. "Although an award of attorney fees under the statute is discretionary, the award must be supported by findings, and those findings, in turn, must be supported by the record." *McGrew v. McGrew*, 139 Idaho 551, 562, 82 P.3d 833, 844 (2003) (citing *Wait v. Leavell Cattle, Inc.*, 136 Idaho 792, 41 P.3d 220 (2002)).

The district court complied with the first *Lunneborg* factor by correctly perceiving the issue of attorney fees as one of discretion. *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194. However, although the district court recognized its considerable discretion, it did not properly wield it due to its failure to make any findings as to how Dix defended his case frivolously, unreasonably, or

without foundation. Importantly, it must be remembered that Idaho Code section 12-121 does not equate a *losing* argument to a *frivolous* one. Rather, it requires that the manner in which an action was "brought, pursued or defended" to be so lacking as to be considered "frivolous and unreasonable." Alternatively, it requires an express finding that the legal basis for a party's handling of the case was so improper or lacking in legal merit that it could be fairly characterized as "without foundation."

Here, Dix argued that the holding in *Johnson v. Highway 101 Investments*, upon which the district court primarily based its decision, is distinguishable from this case. Inasmuch as this Court has never applied the per se rule from *Highway 101 Investments* to a case regarding gates, Dix had a reasonable basis for his argument. Indeed, on appeal we ultimately agreed with Dix that the per se rule did not apply to gates.

Additionally, the district court abused its discretion in awarding Respondents attorney fees because it failed to comply with the written findings requirement of Idaho Rule of Civil Procedure 54(e)(2). This Rule expressly states that "attorney fees under Idaho Code section 12-121 may be awarded by the court only when it finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation, *which finding must be in writing and include the basis and reasons for the award*." *Id.* (emphasis added). We have held that "the absence of written findings does not constitute reversible error." *Smith v. Treasure Valley Seed Company, LLC*, 161 Idaho 107, 110, 383 P.3d 1277, 1280 (2016). Even in the absence of a written finding, "the record as set forth may suffice if the court's reasoning is sufficient." *Lola L. Cazier Revocable Trust v. Cazier*, 167 Idaho 109, 122, 468 P.3d 239, 252 (2020). "The written findings requirement serves to create a clear record, 'so that it might be determined whether the trial court applied the proper law to the appropriate facts.' " *Smith*, 161 Idaho at 110, 383 P.3d at 1280 (citing *Pope v. Intermountain Gas Co.*, 103 Idaho 217, 225, 646 P.2d 988, 996 (1982)).

In this case, the district court merely concluded that "the suit was proper, and that [Dix] defended the case unreasonably throughout the litigation." However, the district court did not articulate any further justification or reasoning as to why it concluded that Dix had defended the case unreasonably. For example, we cannot sufficiently discern from the record the basis for the court's reasoning that the case was defended unreasonably. *Cazier*, 167 Idaho at 122, 468 P.3d at 252. Although we are highly deferential to a trial court's use of its discretion, here we have no way of determining "whether the trial court applied the proper law to the appropriate facts." *Smith*, 161

Idaho at 110, 383 P.3d at 1280. Because the district court's award of attorney fees was not clearly supported by the record below, and did not otherwise comply with Rule 54(e), we conclude that three of the four *Lunneborg* factors for determining an abuse of discretion were met, any one of which would have been sufficient.

In light of our conclusion that Dix had a reasonable basis for his argument regarding the extent to which our holding in *Highway 101 Investments* applies to gates, coupled with the abuse of discretion by the district court in reaching its decision, we reverse the award of attorney fees below.

### D. Neither party is entitled to attorney fees on appeal.

Dix and Respondents seek attorney fees on appeal pursuant to Idaho Code section 12-121. "In any civil action, the judge may award reasonable attorney fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. Although both sides partially prevailed on appeal, we cannot say that any parties' handling of the appeal meets the section 12-121 criteria. Accordingly, we decline to award fees on appeal to any party.

## IV.    CONCLUSION

We grant the Chesers' motion to substitute for Brown. Further, we affirm the district court's decision granting summary judgment to the Berglunds and Brown, but on the alternate grounds set forth herein. This decision is binding on the Berglunds' and Brown's successors-in-interest. Additionally, we reverse the district court's award of attorney fees to Respondents below. Neither party is entitled to attorney fees on appeal. Because of the mixed result, costs are not awarded.

Chief Justice BEVAN, Justices BRODY, STEGNER and ZAHN **CONCUR.**

17